# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**DANIEL DIXON**
Bedford, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

Co-Appellee's Special Advocate:
**DARLENE STEELE McSOLEY**
Bedford, Indiana



FILED

Jan 16 2015, 9:51 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| K.B. and M.B. (Minor Children), | ) |
| | ) |
| And | ) |
| | ) |
| M.W.B. (Father), | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | ) No. 47A04-1404-JC-189 |
| | ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE LAWRENCE CIRCUIT COURT
The Honorable Andrea McCord, Judge
Cause No. 47C01-1211-JC-462 & 47C01-1211-JC-463

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, M.W.B. (Father), appeals the trial court's Order adjudicating his minor children, M.B. and K.B. (collectively, Children), to be Children in Need of Services (CHINS).

We affirm.

ISSUES

Father raises two issues on appeal, which we restate as:

(1) Whether there was sufficient evidence to support the trial court's determination that the Children are CHINS; and

(2) Whether the trial court's intervention was necessary to coerce Father into providing the Children with necessary care and treatment.

FACTS AND PROCEDURAL HISTORY

Father and K.M. (Mother)[1] are the biological parents of M.B., born on September 13, 2001, and K.B., born on April 10, 2005. Father and Mother were divorced and they shared physical and legal custody of the Children. Father and the Children lived with his

---

[1] Mother is not a party to this appeal.

girlfriend (Girlfriend), who was also the Children's custodian. In addition, Girlfriend's minor daughter, M.A.,[2] born on February 5, 2003, lived in the house with Father and the Children. M.A. is Girlfriend's child from a previous marriage and Girlfriend was going through divorce proceedings.

On September 1, 2012, the Lawrence County Police Department received a call that Father and Girlfriend had a domestic fight in the presence of all three children. Officers Chris Roberts (Officer Roberts) and Officer B.J. Fulkerson (Officer Fulkerson) were sent to the residence to investigate. Girlfriend was the only person present in the home; Father had left, and M.B. and K.B. had been picked up by Mother's boyfriend. As the officers approached the residence, they drove past M.A.'s grandfather's vehicle and saw that M.A. was seated in the back seat and was crying. When Officer Roberts walked up to the house, he noticed a broken window. The officers knocked several times before Girlfriend answered the door. As Girlfriend was narrating the night's events, the Officer Roberts noticed that Girlfriend seemed nervous, could not stand still, jumped from subject to subject, and "her jaw muscles kept flexing." (Transcript p. 97). The next day, Father returned to the residence and hashed things out with Girlfriend. Ultimately, both resolved that it was safe to bring the children home, and when the children returned, they all talked, watched movies, and played games late into the night.

On the morning of September 3, 2012, the Indiana Department of Child Services (DCS) received a report of the domestic dispute between Father and Girlfriend. That

---

[2] M.A. is also not involved in this appeal. Facts relating to M.A. are included where appropriate.

same day, DCS family case manager Sylvia Nowakowski (FCM Nowakowski), accompanied by a law enforcement officer, visited Father's and Girlfriend's home. There was a lengthy delay before anyone answered the door; finally, Father and Girlfriend came out, stood on the front porch, and denied FCM Nowakowski access to their home. According to FCM Nowakowski, Father and Girlfriend seemed impaired. More particularly, they were "pacing back and forth, couldn't stand still, [and] appeared very paranoid." (Tr. p. 45). They both had enlarged pupils, and their eyes were blood shot. When questioned regarding the domestic episode of September 1, Father recounted that he had gotten into a heated argument with Girlfriend, that Girlfriend had unintentionally broken a window, and because of the incident, they had arranged for the removal of all three children from the home. FCM Nowakowski requested Father and Girlfriend to take a drug screen, but both declined.

When FCM Nowakowski insisted that she needed to see the children, she was denied permission. After further pressing, Father eventually summoned M.A. to the front porch and started bombarding her with questions such as "[A]re you taken care of [?] [A]re you fed?"—which were followed by M.A.'s short, affirmative answers. (Tr. p. 86). On seeing how frightened M.A. appeared to be and fearing for M.A.'s safety, FCM Nowakowski decided not to pursue her questioning. In the end, FCM Nowakowski arranged for a family team meeting for the next day at 4:00 p.m. so as to address the domestic violence issue.

On September 4, 2012, prior to the 4:00 p.m. family team meeting, FCM Nowakowski, without approval from Father or Girlfriend, visited the three children at

4

their schools for a private meeting. According to FCM Nowakowski, the fact that she was unable to interview the children the day before, presented exigent circumstances requiring a private conference with the children. FCM Nowakowski first questioned M.A. who expressed that she did not want to get anyone into trouble. M.A., however, admitted that there were bad things happening in her home. M.A. informed FCM Nowakowski that Girlfriend had once told her that she had used cocaine, and even though she had never seen Girlfriend use drugs, Girlfriend had voiced to her that she had recently used drugs. M.A. could not recall the exact date Girlfriend had made that statement. On questioning M.A. about the domestic incident occurring on September 1, M.A. stated that M.B. and K.B. were present during the domestic episode. M.A. stated that she was scared and that she called her paternal grandfather to pick her up from the residence. When FCM Nowakowski asked M.A. if she felt safe in the home, M.A. repeated that she really did not want to get anyone into trouble. Next, FCM Nowakowski questioned M.B., who stated that he felt safe at home and did not think that Father or Girlfriend were using any drugs. On questioning K.B., K.B. voiced to FCM Nowakowski that she could not disclose the things that happened inside her home. Later in the day, Father and Girlfriend canceled their 4:00 p.m. meeting.

On September 13, 2012, Father and Girlfriend reached an agreement with DCS to enter into an Informal Adjustment. The Informal Adjustment required Father and Girlfriend, among other things, to allow DCS visits and supervision, to maintain a stable home for all three children, to participate in home-based counseling, and to submit to random drug screens. After the trial court approved the Informal Adjustment on

5

September 13, FCM Nowakowski transferred the case to FCM Miranda Lane (FCM Lane). Father's and Girlfriend's participation with the Informal Adjustment was sporadic. Father and Girlfriend failed to participate in home-based counseling, keep contact with DCS, take drug screens, or allow DCS to visit with the children. On November 9, 2012, the trial court authorized DCS to file a petition alleging each child to be a CHINS.

During the pendency of the CHINS proceedings, Girlfriend's divorce was finalized, whereby she lost physical and legal custody of M.A. Subsequently, on July 3, 2013, the CHINS petition filed on M.A.'s behalf was dismissed. A bifurcated fact-finding hearing with respect to M.B. and K.B. was held on October 22 and on November 19, 2013. On January 31, 2014, the trial court issued an Order finding that the Children were CHINS pursuant to Ind. Code section 31-34-1-1 in that, (1) the Children were both under the age of eighteen (2) their emotional or physical being was impaired and endangered due to unaddressed substance abuse and domestic violence between Father and Girlfriend, and (3) there was failure by both Father and Girlfriend to provide care, treatment, and supervision without the coercive intervention of the court. On March 27, 2014, following a dispositional hearing, the trial court issued a decree granting DCS wardship over the Children and required Father and Girlfriend among other things; to allow DCS visit with the Children, to maintain a stable home for the Children, to formulate a protection plan to protect the Children from abuse or neglect, to refrain from using illegal drugs, to participate in home-based counselling, to submit to random drug screens, and to refrain from domestic violence.

Father now appeals. Additional information will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

DCS bears the burden of proving that a child is a CHINS by a preponderance of the evidence. *In re M.W.*, 869 N.E.2d 1267, 1270 (Ind. Ct. App. 2007). In reviewing a CHINS determination, our court does not reweigh evidence or assess witness credibility. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). We consider only the evidence in favor of the trial court's judgment, along with any reasonable inferences derived therefrom. *Id*. Further, "a CHINS adjudication may not be based solely on conditions that no longer exist. The trial court should also consider the parents' situation at the time the case is heard." *In re R.S.*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013).

When a trial court enters findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), we may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000). In our review, we first consider whether the evidence supports the factual findings. *Id*. Second, we consider whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. T.R. 52(A). While we defer substantially to findings of fact, we do not do so to conclusions of law. *Menard*, 726 N.E.2d at 1210.

7

## II. *Sufficiency of the Evidence*

The purpose of the CHINS adjudication is to "protect the children, not punish parents." *In re N.E.*, 919 N.E.2d at 106. When it is in the child's best interest, the State may exert its *parens patriae* power and intervene to safeguard the child's welfare. *Id.* However, trial courts must balance the child's needs against the due process rights of the parents. *Id.* In order to support a CHINS adjudication, the CHINS statute provides that DCS must establish that

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

> (2) the child needs care, treatment, or rehabilitation that:
> (A) the child is not receiving; and
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-1. The third element of a CHINS adjudication is that the child must be less than eighteen years of age, which is not disputed in the case at hand. I.C. § 31-34-1-1.

Father first argues that DCS presented insufficient evidence in establishing that the Children's emotional or physical well-being was endangered under his care. Here, the trial court concluded:

> 7. Inasmuch as evidence presented by DCS established by preponderance that (1) [Children], both of whom are under eighteen years of age, witnessed domestic violence in the home of Father and [Girlfriend] which continued due to urgent pleas that it stop and (2) Father and [Girlfriend] were observed by a trained law enforcement personnel and trained DCS personnel to be under the influence at least [of] one unknown intoxicating substance on the night of the physical violence and again two

days later, the court concludes that the [C]hildren's mental and physical conditions are seriously endangered as the result of Father's and [Girlfriend's] inability, refusal or neglect to supply them with necessary supervision.

8.     Inasmuch as evidence presented by DCS established by a preponderance that (1) Father and [Girlfriend] continue to deny that there has been domestic violence in their home and continue to deny any substance abuse problems, (2) neither Father nor [Girlfriend] has received counseling treatment to address their domestic violence and substance abuse problems, and (3) Father and [Girlfriend] utterly flouted the court-approved informal adjustment in which they had agreed to participate, the court concludes that the children need care, treatment or rehabilitation that they are not receiving and which is unlikely to be provided or accepted without the coercive intervention of the court.

****

(Appellant's App. p. 138).

Father contends that the trial court's conclusion that the Children's physical and emotional well-being was endangered as a result of observing the domestic dispute is unsupported by the record. Specifically, he argues that since there was no finding that the Children "experienced emotional trauma" by witnessing the violence, the trial court's conclusion that their mental and physical well-being was endangered under his care is erroneous. (Appellant's Br. 15). He also adds that the Children's psychological evaluations did not reveal that the Children experienced any emotional trauma from the domestic violence. Father directs our attention to the steps he took after the physical altercation he had with Girlfriend. Specifically, he argues that even though their domestic dispute got out of hand, he and Girlfriend followed "their own" safety plan which ensured the removal of all three children from their home. (Appellant's Br. p. 16). Father states that on that specific night, he separated with Girlfriend but returned the next day to work on their issues. Furthermore, he asserts that it was only after he

9

hashed things out with Girlfriend, that he determined that it was safe for all three children to return home.

We note that a child's exposure to domestic violence can support a CHINS finding. *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010). Moreover, the CHINS statute does not require the juvenile court and DCS to wait until a child is physically or emotionally harmed to intervene; rather, a child may be determined to be a CHINS if his or her physical or mental condition is endangered. *In re R.P.*, 949 N.E.2d 395, 401 (Ind. Ct. App. 2011). In the present case, the Children were old enough to comprehend the violence. On the initial interview that FCM Nowakowski conducted at the children's school, M.A., reported that her half-siblings, M.B. and K.B., were present in the room while the parents were fighting, and that they were crying. Indicating that the violence was repetitive, M.A. also stated that was how the Children reacted *when* Father and Girlfriend fought.

When DCS first became involved, it was to ensure that the Children were not exposed to violence. Through DCS's intervention, Father and Girlfriend agreed to an Informal Adjustment, which required both to attend domestic violence counseling. Father and Girlfriend were referred to George Freeman of the Ireland Home Based Services (Counselor Freeman) for couples therapy and substance abuse counseling. Father initially complied but did not attend to all counseling sessions. Counselor Freeman testified that he met with Father three times in 2012 for counseling but there had been no meetings in 2013. The record reveals that there was a similar pattern with

respect to Girlfriend. According to Counselor Freeman, there were still unmet needs at the time the services were terminated.

Father also contends that the domestic disturbance was an isolated case and that the record lacks evidence of a pattern of violence. He cites *In re N.E.*, 919 N.E.2d at 106, which held that a child was properly adjudicated as CHINS based upon mother's failure to protect her children from *ongoing* domestic violence between herself and alleged father of the child's sibling. Accordingly, Father argues that absent the recurrence of violence, the trial court erred in determining the Children were CHINS based on a single episode.

However, during back to FCM Nowakowski's initial interview with the children, M.A. indicated that the domestic violence between Father and Girlfriend was repetitive. Specifically, M.A. reported the Children were present in the room during the violence, they were crying, and that's how they reacted *when* Father and Girlfriend fought. Even if no other evidence of violence exists, we reiterate that the CHINS statute does not require the juvenile court and the DCS to wait until a child is physically or emotionally harmed to intervene. *See In re R.P.*, 949 N.E.2d 401. In addition, we note that although there were no further reported cases of violence when the trial court issued its CHINS finding, this by no means proves that Father's and Girlfriend's domestic violence problems had been resolved. Particularly, in light of the fact that Father and Girlfriend disregarded the provisions of their Informal Adjustment to participate in domestic violence counseling, there is no surety that the violence will not recur. Under these facts and circumstances, we conclude that the trial court's decision that the Children's

11

physical or mental health was seriously endangered due to their exposure to the violence was not erroneous.

Father also argues that although DCS suspected that he and Girlfriend were using illegal drugs, no drug test was assigned; as such, the trial court's conclusion that they were using drugs is based on speculation and conjecture. We disagree. Pursuant to the Informal Adjustment, Father and Girlfriend agreed to submit to random drug screens with which they subsequently refused to comply. Moreover, absent drug tests, we cannot resolve that the trial court's conclusion that Father and Girlfriend did struggle with substance abuse is erroneous or unsupported by the evidence. The testimony of Officer Roberts, M.A., Girlfriend, and FCM Nowakowski independently supports the conclusion that Father and Girlfriend had a possible drug problem that needed to be addressed. Officer Roberts, who was dispatched to investigate the domestic disturbance testified that Girlfriend seemed nervous, could not stand still, jumped from subject to subject, and "her jaw muscles kept flexing." (Tr. p. 97). According to Officer Roberts, Girlfriend's movements were similar to a person who had been using illegal drugs. M.A. also testified that Girlfriend had once told her that she had used cocaine. During the fact-finding hearing, Girlfriend indeed admitted that she had a past drug problem. In addition, FCM Nowakowski testified that on September 3, 2012, she observed Father and Girlfriend having some impairment. More particularly, FCM Nowakowski stated that they were pacing back and forth, couldn't stand still, appeared very paranoid, both had enlarged pupils, and their eyes were blood shot. In light of the foregoing, we cannot

conclude that the trial court's conclusion that Father and Girlfriend did struggle with substance abuse is erroneous.

## II. *Coercive Authority of the Court*

Lastly, Father challenges the necessity of the trial court's coercive intervention. In *re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014), our supreme court eloquently explained that the focus on CHINS proceedings is on the "best interests of the child and whether the *child* needs help that the parent will not be willing or able to provide—not whether the parent is somehow 'guilty' or 'deserves' a CHINS adjudication. But that help comes not by invitation, but compulsion—imposing the court's 'coercive intervention' into family life. The intrusion of a CHINS judgment, then, must be reserved for families who *cannot* meet those needs without coercion—not those who merely have *difficulty* doing so." *Id.*

As mentioned earlier, DCS first became involved with the case due to the domestic violence issue, and also because they had a reasonable suspicion that Father and Girlfriend were using illegal drugs. In the CHINS petition, DCS stated that Father and Girlfriend failed to attend scheduled counseling, keep contact with DCS, submit to drug screens, and allow DCS to visit the Children. The trial court concluded in part

> neither Father nor [Girlfriend] has received counseling treatment to address their domestic violence and substance abuse problems, and (3) Father and [Girlfriend] utterly flouted the court-approved [I]nformal [A]djustment in which they had agreed to participate, the court concludes that the [C]hildren need care, treatment or rehabilitation that they are not receiving and which is unlikely to be provided or accepted without the coercive intervention of the court.

(Appellant's App. p. 138). Father claims that "no family is obligated to participate" in an Informal Adjustment without consenting. (Appellant's Br. p. 18). He further states

13

that if a court uses a "parent's failure" as evidence, "it will create a substantial disincentive for voluntary participation [of] such agreements." (Appellant's Br. pp 18-19).

We note that a CHINS adjudication under Indiana Code section 31-34-1-1 requires three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and—perhaps most critically—that those needs are unlikely to be met without State coercion. Father claims that his primary reason for non-compliance with DCS was the punitive nature of the services. We disagree. As noted in the foregoing, the purpose of the CHINS adjudication is to "protect the children, not punish parents." *In re S.D.*, 2 N.E.3d at 1286. As such, the CHINS statute is intended to protect children who are "endangered by parental action or inaction"; and a court need not "wait until a tragedy occurs to intervene." *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009).

Father is also incorrect in stating that he and Girlfriend were not obligated to comply with the Informal Adjustment. We note that an informal adjustment is an agreement between DCS and a family where the family agrees to participate in services in an effort to prevent the children from being formally declared CHINS. *See* I.C. ch. 31-34-8. In contemplating whether to approve an entry of an informal adjustment, a trial court has to find "the intake officer . . . has probable cause to believe that the child is a child in need of services." I.C. § 31-34-8-1. Here, the trial court determined that there was probable cause that the Children were CHINS based on the domestic violence and possible drug use. The Informal Adjustment required Father and Girlfriend to follow

14

through with certain services, but they did not. Even after the CHINS petition was filed in November 2012, instead of actively participating, Father's and Girlfriend's involvement with the services remained meager. In January 2013, DCS sought the trial court's intervention to compel Father and Girlfriend to present the Children for DCS supervision, and a court order was issued compelling Father and Girlfriend to allow FCM Lane to visit with the family once every month. In the same month, DCS filed yet another emergency motion to compel and motion for rule to show cause, averring that FCM Lane had been unsuccessful in scheduling her home visits and that Father had not disclosed where the family lived. The same day, the trial court issued an order finding Father and Girlfriend in contempt of its prior order. Again, the court instructed Father and Girlfriend to allow FCM Lane or any other DCS worker to visit with the Children either at home or at school. Even with a contempt order in place, Father and Girlfriend did not comply with the DCS scheduled visits.

In addition, Father argues that the court's intervention was unnecessary since the Children were performing well in school, were well adjusted, appropriately clothed, nourished, and had a place to sleep. As for Father's claim that the Children were performing well in school, the record reveals that while in Father's and Girlfriend's care, the Children missed more than 10% of their school days in the 2011-2012 school year. The Children's court appointed special advocate (CASA) testified that she was concerned that Father and Girlfriend were unable to get up and get the Children off to school, and it caused her to suspect a possible drug impairment. The CASA testified that in the fall semester of 2013, and shortly before the fact-finding hearing, the Children lived with

15

their Maternal Grandmother, during which time the Children's school attendance and grades had been excellent.

As for Father's claim that the Children had a place to sleep, the record is barren that the Children had a stable home. The record is rife with conflicting evidence as to where the family resided. Father testified that after losing his home in October 2012, and prior to the CHINS proceedings, the family moved in with his father. Father maintained that has always been his legal residence. However, Father testified that at times, the family resided in a friend's garage. Father further testified that sometimes the family would rent a room at Super 8 motel "on the weekends" so to allow the Children to "swim in the pool" and use the hot tub and internet facilities. (Tr. p. 242).

Contrasting Father's claim that they had a stable home, FCM Lane testified that she was concerned that the Children did not have a steady home since Father and Girlfriend were evasive about their address. Whenever FCM Lane would attempt to schedule a visit, Father and Girlfriend would cancel or tell her that the Children were unavailable. She testified that in her quest to verify the Children's home, she received reports from family members indicating that, from time to time, the family stayed at various hotels. When she called the hotels, one confirmed that they had never been there, and the other established that the family was once there but not anymore. FCM Lane also attempted to locate Mother, who has joint custody of the Children. FCM Lane testified that in the course of her investigation, she learned that Mother did not have a suitable home. During the CHINS proceedings, Mother was living at a shelter where she

16

could not have the Children, and that maternal grandmother lived with the Children during Mother's custodial periods.

Likewise, the CASA testified that she was also uncertain as to where the family lived. She testified that out of the nine family visits she had scheduled, she was successful in meeting the family on only two occasions. The first visit was in March 2013, and the Children were staying with maternal grandmother. The last visit the CASA made was in September 2013, right before the fact-finding hearing, and the Children were residing in the home of their paternal grandfather.

We note that a CHINS finding should consider the family's condition not just when the case was filed, but also when it is heard. *In re S.D.*, 2 N.E.3d at 1290. Assessing the evidence as a whole, there is ample indication that Father and Girlfriend, did little-to-nothing to cooperate with DCS throughout these proceedings. Father and Girlfriend failed to address their domestic violence and substance abuse problems through home-based counseling. The record is also replete of Father's and Girlfriend's missed appointments with DCS. FCM Lane testified that it had "been four months out of the past year" in which Father and Girlfriend had not complied with the monthly DCS visits. (Tr. p. 169). Father and Girlfriend had also failed to maintain contact with DCS. Further, DCS was uninformed of the family living quarters. In light of the evidence before us, we find that Father's lack of cooperation with DCS highlights his inability or refusal to properly care for the Children. Accordingly, we cannot say that the trial court's conclusion that the coercive intervention of the court was necessary is clearly erroneous.

CONCLUSION

In light of the foregoing, we conclude that the trial court's Order adjudicating Children as CHINS is not erroneous.

Affirmed.

MATHIAS, J. and CRONE, J. concur