## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 28 2017, 10:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James A. Edgar
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Newell
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of K.D. and J.T. (Minor Children),

And

J.S. (Mother),

*Appellant-Respondent,*

v.

Marion County Department of Child Services,

*Appellee-Petitioner,*

And

Child Advocates, Inc.,

March 28, 2017

Court of Appeals Case No. 49A02-1610-JC-2353

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Jennifer Hubartt, Magistrate

Trial Court Cause No. 49D09-1607-JC-2365 & 49D09-1607-JC-2366

*Appellee-Guardian ad Litem.*

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, J.S. (Mother), appeals the trial court's Order adjudicating her minor children, K.D. and J.T. (collectively, Children), as Children in Need of Services (CHINS).

We affirm.

## ISSUE

Mother presents us with one issue on appeal, which we restate as: Whether there was sufficient evidence to support the trial court's determination of the Children as CHINS.

## FACTS AND PROCEDURAL HISTORY

Mother and Kevin Davidson (Davidson) are the biological parents of K.D., born on July 5, 2007. Mother and Davidson were married, but have since instituted divorce proceedings. Mother and Robert Terhune (Terhune) are the

biological parents of J.T., born January on 12, 2012.  Terhune established paternity over J.T.[1]

[5] On June 20, 2016, the Indiana Department of Child Services (DCS) received a report alleging that K.D. and J.T. had problems with lice and lacked a stable home.  The following day, DCS family case manager Kwanza Johnson (FCM Johnson) visited the address listed on the report to assess the allegations.  At the address listed, an elderly woman, who later was identified as Mother's aunt, met FCM Johnson on the porch.  She claimed not to know Mother.  Eventually, FCM Johnson was able to contact Mother by phone.  Mother explained that the address listed was correct but that, at the time, the Children were staying with their respective fathers.  FCM Johnson made three attempts to visit Mother's home and spoke with her eleven times by phone.  Despite numerous requests to visit the residence, FCM Johnson was not able to conduct an assessment because there was always "a reason as to why [Mother] could not meet."  (Transcript p. 17).

[6] FCM Johnson visited Terhune's residence and spoke with Terhune and J.T. Terhune explained that he had concerns about J.T.'s hygiene as he was dirty a lot and "also very hungry."  (Tr. p. 17).  J.T. keeps his hair intentionally short because he has had lice numerous times over the past year.  When meeting with Davidson, FCM Johnson learned that K.D. also had recurring lice infestations.

---

[1] Neither father participates in this appeal; however, facts with respect to them will be included when necessary for our decision.

Davidson used a medicated treatment twice monthly to treat K.D.'s hair. Davidson also told her that when residing with Mother the Children sleep on the couch and on the floor.

[7] On July 14, 2016, DCS filed a CHINS petition, claiming that Mother had failed to provide the Children with a safe, stable, and appropriate home environment. The specific allegations included that since February 2016, K.D. had been to the hospital three times to have severe head lice treated. K.D's scalp was bleeding and black in color. Both Children also were alleged to have ringworm and poor hygiene. K.D. "is so dirty that when he was washed, you could see the dirt come off in the bottom of the tub. [] K.D. does not have a tooth brush." (Appellant's App. Vol. II, pp. 37-38). "J.T. is often dirty like he has not bathed in days and cries because he is so hungry." (Appellant's App. Vol. II, p. 38). Both Children indicated that they did not bathe at Mother's home, nor were their clothes washed. J.T. also expressed that he did not feel safe at Mother's home because her boyfriend "grabs him and throws him around." (Appellant's App. Vol. II, p. 40). The petition also alleged that Mother lacks stability and has moved at least "21 times" in the last six years. (Appellant's App. Vol II, p. 38). That same day, the trial court conducted the initial hearing on DCS's petition and granted DCS wardship over the Children. The court removed the Children from Mother's care, authorized in-home placement with their respective fathers, and granted Mother supervised parenting time.

[8] Later that same month, the case was assigned to DCS family case manager Crystal Johnson [FCM Crystal]. FCM Crystal attempted to meet with Mother

to conduct the home assessment but each time Mother cancelled the appointment. Although DCS recommended Mother to participate in home-based case management services and supervised parenting time, Mother only engaged in parenting time.

[9] On August 29, 2016, the trial court conducted a CHINS evidentiary hearing. During the hearing, Mother testified that she works two jobs for a total of approximately fifty hours a week. While she is at work, the Children would either be in school or cared for by a family member or friend. Mother received food stamps in the amount of $440 per month until these lapsed in May of 2016 because she had failed to get recertified. With respect to the Children's lice problems, Mother claimed to have contacted the Children's pediatrician and washed their hair with a medicated lice treatment. She admitted that FCM Crystal had contacted her "five, maybe six" times to assess her home. (Tr. p. 44). Even though Mother cancelled the appointments each time, she never personally reached out to DCS to reschedule. Mother also confirmed to have moved four times in the past year. She explained that she lived with her aunt for a while, they stayed in a hotel for four weeks, and at a place "that is on Lockburn." (Tr. p. 46). Despite the frequent moves, Mother was adamant that the Children's schooling was not affected as she kept K.D. in the same school throughout.

[10] Kenneth Moran (Moran), a case manager at New Horizon, Incorporated, supervised Mother's parenting time. He testified that Mother attended each visitation and displayed a "normal interaction between a parent and a child."

(Tr. p. 32). The Children were always excited to see her and expressed a strong bond with her. Moran did not have any reason to believe that the Children would be seriously endangered in Mother's care.

[11] That same day, August 29, 2016, the trial court entered its dispositional order, adjudicating the Children to be CHINS. The trial court found that:

> the [C]hildren's physical or mental condition is seriously
> impaired or endangered as a result of [Mother's] inability, refusal
> or neglect to provide the [C]hildren with food, clothing, shelter,
> medical care, education, and supervision; the [C]hildren are in
> need of safe and stable home environment which [Mother] has
> not provided; and the coercive intervention of the [c]ourt is
> required because the [C]hildren are in need of care, treatment, or
> rehabilitation and a safe and stable home environment that they
> are not receiving or would not receive without the coercive
> intervention of the [c]ourt.

(Appellant's App. Vol. II, p. 81). The trial court continued the Children's placement with their fathers. On September 26, 2016, the trial court entered dispositional and parental participation orders, ordering Mother to participate in home-based therapy and home-based case management services.

[12] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[13] DCS bears the burden of proving that a child is a CHINS by a preponderance of the evidence. *In re K.B.*, 24 N.E.3d 997, 1001 (Ind. Ct. App. 2015). In

reviewing a CHINS determination, our court does not reweigh evidence or assess witness credibility. *Id.* We consider only the evidence in favor of the trial court's judgment, along with any reasonable inferences derived therefrom. *Id.* Further "a CHINS adjudication may not be based solely on conditions that no longer exist. The trial court should also consider the parents' situation at the time the case is heard." *In re R.S.*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013).

[14] When a trial court, as here, enters findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), we may not set aside the findings or judgment unless they are clearly erroneous. *In re K.B.*, 24 N.E.3d at 1001. In our review, we first consider whether the evidence supports the factual findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id.* at 1002. A judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* We give due regard to the trial court's ability to assess the credibility of the witnesses. T.R. 52(A). While we defer substantially to findings of fact, we do not do so for conclusions of law. *In re K.B.*, 24 N.E.3d at 1002.

## II. *Sufficiency of the Evidence*

[15] The purpose of the CHINS adjudication is to "protect the children, not punish parents." *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*. When it is in the child's best interest, the State may exert its *parens patriae* power and intervene to safeguard the child's welfare. *In re K.B.*, 24 N.E.2d at 1002.

However, trial courts must balance the child's needs against the due process rights of the parents. *Id.* To support a CHINS adjudication, the CHINS statute provides that DCS must establish that, before the child becomes eighteen years of age:

> (1) The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) The child needs care, treatment, or rehabilitation that:
>
> > (A) The child is not receiving; and
> >
> > (B) Is unlikely to be provided or accepted without the coercive intervention of the court

Ind. Code § 31-34-1-1. "That final element guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the *ability* to provide for their children,' not merely where they 'encounter *difficulty* in meeting a child's needs.'" *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[16] Not challenging the trial court's findings, Mother instead focuses on the trial court's conclusion. Specifically, she contends that (1) there was insufficient evidence establishing that "a manifestation of head lice and poor hygiene" had seriously endangered the Children; (2) Mother's changing residences and

cancelled appointments with DCS did not support the conclusion that she lacked stable housing; and (3) the Children's needs were being met. (Appellant's Br. p. 11).

[17] The CHINS statute does not require the trial court and DCS to wait until a child is physically or emotionally harmed to intervene; rather, a child may be determined to be CHINS if his or her physical or mental condition is endangered. *In re R.P.*, 949 N.E.2d 395, 401 (Ind. Ct. App. 2011). Here, the evidence reflects that both Children had a severe and recurring infestation of lice when they were with Mother. When the Children are in the care of their respective fathers, they receive medicated lice treatment, often twice a month. To keep this problem under control, J.T. keeps his hair intentionally very short. Through testimony DCS established that J.T was "dirty a lot" and also "very hungry." (Tr. p. 17). While staying with Mother, the children "were sleeping on the couch and the floor." (Tr. p. 18).

[18] Although every child may encounter the occasional lice problem, we find that the almost persistent infestation which is present here, combined with Mother's unwillingness to treat the Children's hair and scalp, resulted in an endangerment of the Children's health. These findings of poor hygiene while in Mother's care, the Children's lack of nutrition, and appropriate sleeping conditions clearly support the trial court's conclusion that the Children's wellbeing was seriously impaired.

[19] The record is also devoid of any evidence that the Children had a stable home while residing with Mother. During the factfinding hearing, Mother admitted to moving residences at least four times in the past year. Terhune, J.T.'s father, testified that Mother had moved four times in the past year without filing a notice of intent to relocate in the paternity cause. To abate DCS's suspicions of neglect, both FCMs attempted to visit Mother's residence to assess the condition of her home. FCM Johnson set up three visits and FCM Crystal scheduled five visits. However, each time prior to the scheduled appointment, Mother would cancel with an excuse. To date, DCS has yet to inspect Mother's residence.

[20] Children who are "endangered by parental action or inaction" are protected under the CHINS statute. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Mindful of the evidence before us, we find that Mother's lack of cooperation with DCS highlights her inability or refusal to properly care for the Children. *See, e.g., In re K.B.*, 24 N.E.2d at 1007. Accordingly, we cannot say that the trial court's adjudication of the Children as CHINS is clearly erroneous.

## CONCLUSION

[21] In light of the foregoing, we conclude that the trial court's Order adjudicating Children as CHINS is not erroneous.

[22] Affirmed.

[23] Najam, J. and Bradford, J. concur