In re the Matter of R.P. and L.P.,
Children Alleged to be Children
in Need of Services

N.P., Appellant–Respondent,

v.

Indiana Department of Child Services,
Appellee–Petitioner.

No. 84A05–1010–JC–650.

Court of Appeals of Indiana.

May 17, 2011.

Mark Everett Watson, Terre Haute, IN, Attorney for Appellant.

Elizabeth A. Lewis, Indiana Department of Child Services, Terre Haute, IN, Robert J. Henke, DCS Central Administration Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Respondent, N.P. (Mother), appeals the trial court's finding that her children, R.P. and L.P., are children in needs of services (CHINS).

We affirm.

### ISSUES

Mother raises two issues on appeal, which we restate as the following three issues:

(1) Whether the trial court had jurisdiction to hear the case even though it failed to conduct a factfinding hearing within the 60–day statutory time limit;

(2) Whether the Vigo County Department of Child Services (DCS) presented sufficient evidence to prove by a preponderance of the evidence that R.P. and L.P. are CHINS; and

(3) Whether the trial court denied Mother procedural due process.

### FACTS AND PROCEDURAL HISTORY

R.P. and L.P. are the daughters of Mother and L.P. (Father), who were involved in a divorce and custody dispute throughout all of the incidents in question in this case. R.P. was born in 2004 and was six years old during the trial court's hearing, and L.P. was born in 2006 and was four years old during the trial court's hearing. On March 30, 2009, DCS received a report that Mother was in the hospital as a result of being beaten by Father. When DCS investigated the re-

port, it determined that Mother had attempted suicide and that the report was false. As a result, Father was given temporary custody of R.P. and L.P. until shortly after Mother was released from the hospital. At that time, Mother and Father resumed a shared custody arrangement.

On May 26, 2009, Mother reported to DCS and to the Terre Haute City Police Department that Father had inappropriately touched L.P. during one of L.P.'s visits with Father. In her report, Mother claimed that L.P. had told her that Father had "touched [L.P.'s] peepee" and "hurt [her] peepee." (July 12, 2010 Transcript p. 45).[1] Mother called DCS case manager Jennifer Bush (Bush) directly, and Bush recommended that Mother call L.P.'s pediatrician for advice regarding where to take L.P. for medical attention.

After talking with Bush, Mother scheduled an exam for R.P. and L.P. at the Wishard Hospital Center for Hope (Wishard). Prior to this scheduled exam at Wishard, she took L.P. to Union Hospital, where L.P. underwent a sexual abuse examination. L.P. slept during the investigation, and the examiners were unable to find any evidence of sexual molestation. Subsequently, Mother kept her appointment at Wishard, and both girls were examined there. As at Union Hospital, the examiners at Wishard were unable to find any evidence of sexual molestation in either of the girls.

In addition, both the Terre Haute City Police Department and DCS conducted investigations of Mother's allegations. Terre Haute City Police Detectives David Thompson (Detective Thompson) and Rick Decker (Detective Decker) interviewed Mother and concluded that her claims

were unsubstantiated. DCS family case manager Megan Cottrell (Cottrell) interviewed both girls and did not find any evidence of sexual molestation. Nevertheless, Cottrell recommended to Mother that both girls receive counseling.

On October 20, 2009, Mother filed another sexual abuse report with the police department and with DCS. Cottrell conducted a joint investigation with the police department and interviewed the girls. During the interview, R.P. stated that "daddy had touched her peepee." (July 9, 2010 Tr. p. 33). Later in the interview, though, R.P. admitted that she had lied about the inappropriate touching and that Mother had told her to tell Cottrell that her Father had touched her. Consequently, DCS concluded that Mother's allegations were unsubstantiated.

On December 12, 2009, Mother took R.P. and L.P. to the emergency room at Union Hospital again after R.P. complained that her "peepee hurt" and Mother noticed that R.P.'s private area was red, irritated, and swollen. (July 12, 2010 Tr. p. 62). Both children denied any sexual abuse, but they both received sexual abuse examinations. The hospital did not report any abuse based on these examinations. Mother followed the hospital's examination with an appointment with R.P.'s pediatrician, and R.P.'s pediatrician diagnosed R.P. with a yeast infection.

Again, on February 24, 2010, Mother filed a report that Father had inappropriately touched R.P. and L.P. Family case manager Jessica Klatte (Klatte) called Mother regarding the report. Mother stated that "she did not want [Cottrell] . . . to conduct an interview with the girls" and that Klatte would "need a [court order]" to

---

1. The trial court held a factfinding hearing on both July 9, 2010 and July 12, 2010, but the transcripts from the two days are not consec- utively paginated. As a result, we will hereaf- ter refer to the transcripts according to the dates of the hearings.

conduct an interview. (July 9, 2010 Tr. p. 66). Mother told Klatte, though, that she had a video of the girls admitting that Father had inappropriately touched them. Later that day, Mother called Klatte back and told Klatte that she would not need a court order to interview the girls, but that Mother wanted to sit in on the interview. Klatte informed Mother that she was not allowed to sit in on the interview, and Mother again refused to allow the interview without a court order.

The following day, Klatte received the video that Mother had told her about and watched it with her supervisor. Both Klatte and her supervisor believed that Mother was coaching the girls through their answers in the video. Klatte called Detective Decker, who had also received a copy of the video, and Detective Decker shared Klatte's opinion. After watching the video, Klatte contacted Father during his visitation day with the girls, and Father brought the girls in for an interview with DCS. Bush conducted the interview and did not find any evidence of abuse.

On March 3, 2010, Klatte called Mother concerning the results of DCS's interview. Klatte spoke with Mother about therapy, and Mother stated that the girls were in therapy. When Klatte informed Mother that she would have to speak to the therapist and have the therapist sign a release, Mother admitted that the girls had not started therapy yet and were starting on March 11, 2010. Mother also told Klatte that the girls had seen a therapist two or three times since Mother first reported abuse in May of 2009, but had not received therapy otherwise.

Based on Mother's multiple reports of sexual abuse and the multiple times that R.P. and L.P. were subjected to sexual abuse examinations, DCS began to believe that Mother was endangering R.P. and L.P. As a result, on March 10, 2010, DCS obtained an *ex parte* detention order and removed R.P. and L.P. from Mother's care, citing that an emergency existed due to allegations that R.P. and L.P.'s physical or mental condition was seriously impaired or endangered if not immediately removed from Mother's home and taken into protective custody. The next day, on March 11, 2010, DCS filed petitions alleging that R.P. and L.P. were CHINS pursuant to Ind. Code §§ 31–34–1–1; –2 because Mother had made false accusations against Father regarding domestic and sexual abuse.

On March 12, 2010, the trial court held a preliminary inquiry hearing and determined that there was probable cause to believe that R.P. and L.P. were CHINS. The trial court also ordered that R.P. and L.P. continue to be placed with Father. On July 9 and 12, 2010, the trial court held a factfinding hearing on DCS's petitions. At the conclusion of the hearing, the trial court took the matter under advisement, and, on August 19, 2010, found R.P. and L.P. to be CHINS. On September 14, 2010, the trial court entered a Dispositional Order continuing R.P. and L.P.'s placement with Father and their wardship with DCS.

Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Jurisdiction*

■ As a preliminary issue, we must first address whether the trial court had jurisdiction to decide this case even though the trial court failed to conduct a factfinding hearing within the statutorily prescribed time limit. Indiana Code section 31–34–11–1 mandates that:

(a) Except as provided in subsection (b), unless the allegations of a petition have been admitted, the juvenile court shall complete a factfinding

hearing not more than sixty (60) days after a petition alleging that a child is a child in need of services is filed in accordance with [I.C.] § 31–34–9.

(b) The juvenile court may extend the time to complete a factfinding hearing, as described in subsection (a), for an additional sixty (60) days if all parties in the action consent to the additional time.

Mother argues that the trial court should have dismissed the CHINS proceedings because the petitions alleging that R.P. and L.P. were CHINS were filed on March 11, 2010, whereas the trial court conducted the factfinding hearing on July 9, 2010, 119 days later. This time period was outside of the 60 day limit allowed by I.C. § 31–34–11–1, and Mother notes that she did not consent to an extension of the time limit. She contends that, as a result, the trial court did not have subject matter jurisdiction over the case and should have dismissed the case *sua sponte.*

 Unlike Mother, we do not characterize the 60–day limitation as a limitation on subject matter jurisdiction that the court is required to consider *sua sponte.* Instead, we have previously held that "[s]tatutes of limitations are procedural as opposed to substantive in nature...." *Bennett v. Bennett,* 172 Ind.App. 581, 361 N.E.2d 193, 196 (1977). Generally, statutes of limitations are "laws of repose, merely affecting remedy, and are available only as defenses." *Id.* Such statutes should not be construed to reach an absurd result. *Id.* In addition, failure to raise a statute of limitations issue before judgment may amount to "a waiver of the statutory bar." *See id.* This is because "we look with disfavor upon points raised for the first time on appeal in the higher court or in original actions without first raising the issue with specific objections

thereto at the first opportunity in the trial court...." *Id.*

 In light of this precedent, we determine that Mother has waived her argument here because she had the opportunity to raise it as a defense before the trial court and failed to do so. Notwithstanding waiver, we will address Mother's arguments in regards to the time limit established by I.C. § 31–34–11–1.

Our decision in *Parmeter* is directly on point for this issue. *See Parmeter v. Cass Cnty. Dept. of Child Servs.,* 878 N.E.2d 444 (Ind.Ct.App.2007). In *Parmeter,* we discussed whether the term "shall" in I.C. § 31–34–11–1 "connotes a mandatory as opposed to a discretionary import." *Id.* at 447–48. We concluded that:

> A statute containing the term "shall" generally connotes a mandatory as opposed to a discretionary import. However, "shall" may be construed as directory instead of mandatory "to prevent the defeat of the legislative intent.".... Thus, the term "shall" is directory when the statute fails to specify adverse consequences, the provision does not go to the essence of the statutory purpose, and a mandatory construction would thwart the legislative purpose.

*Id.* at 448 (internal citations omitted). We clarified in *Parmeter* that I.C. § 31–34–11–1 uses "shall" but does not specify any adverse consequences for the failure to comply with the 60–day time limit. *Id.* Also,

> [h]olding the hearings within the statutory time limits does not go to the purpose of the CHINS statutes, which were enacted in part to "assist[ ] parents to fulfill their parental obligations" and to "remove children from families only when it is the child's best interest...." [A] mandatory construction would thwart those legislative purposes by re-

quiring dismissal of CHINS cases where continuances of the factfinding or dispositional hearings are needed for legitimate reasons, such as the unavailability of parties or witnesses or the congestion of the court calendar, merely because one party is being a stalwart.

*Id.* (internal citations omitted).

This precedent indicates that the legislative concerns underlying I.C. § 31–34–11–1 are more imperative than the 60–day time limit in certain circumstances. Mother cites *Parmeter,* though, for the principle that a trial court must have a legitimate reason to delay a factfinding hearing. Further, she asserts that "there is nothing in the record to denote any reason for delay such as unavailability of the parties, witnesses or congestion of the court's docket." (Appellant's Br. p. 20).

Although Mother points to the absence of a legitimate reason in the record, she does not claim that there was an inappropriate reason for the trial court to delay the factfinding hearing; nor can we find evidence of an inappropriate reason. We also interpret *Parmeter* more broadly than Mother. The intent of our discussion in *Parmeter* was to indicate that there are important legislative concerns underlying I.C. § 31–34–11–1 that should not be overlooked due to excusable procedural delays. In explaining this principle in *Parmeter,* we used the phrase "legitimate reasons, such as the unavailability of parties or witnesses or the congestion of the court calendar," to illustrate instances where the important legislative concerns should supersede procedural concerns. *Parmeter,* 878 N.E.2d at 448. It is apparent from the context of the case that this phrase was illustrative and did not establish an exhaustive list.

We agree with Mother that the legitimacy of a reason for a delay is an important factor in determining whether a trial court appropriately conducted a factfinding hearing outside of the 60–day time limit. We decline, however, to find the trial court's actions inappropriate when Mother has not produced any evidence showing that there was an illegitimate reason for the delay.

## II. *Sufficiency of the Evidence*

 Next, Mother argues that DCS did not prove by a preponderance of the evidence that R.P. and L.P. are CHINS. When a trial court has entered special findings of fact and law, we apply a two-tiered standard of review. *Schrader v. Porter Cnty. Drainage Bd.,* 880 N.E.2d 304, 307 (Ind.Ct.App.2008). First, we determine whether the evidence supports the findings, and, second, whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id.* We neither reweigh the evidence nor reassess the credibility of the witnesses when we review the trial court's findings. *Id.* Instead, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. *Id.*

Pursuant to Indiana Code sections 31–34–1–1 and 31–34–1–2, a child is found to be in need of services if, before the child turns eighteen:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

\* \* \*

Sec. 2...

(1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and

(2) the child needs care, treatment or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court....

We have recognized that parents have a fundamental right to raise their children without undue influence from the State, but that right is limited by the State's compelling interest in protecting the welfare of children. *G.B. v. Dearborn Cnty. Div. of Family and Children,* 754 N.E.2d 1027, 1032 (Ind.Ct.App.2001). The CHINS statutes do not require that a trial court wait until a tragedy occurs to intervene. *In re A.H.,* 913 N.E.2d 303, 306 (Ind.Ct.App.2009). Instead, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.*

We find that DCS produced sufficient evidence to prove by a preponderance of the evidence that R.P. and L.P. are CHINS. The facts of *In re V.C.* are very similar to the facts of this case. *See In re V.C.,* 867 N.E.2d 167, 170 (Ind.Ct.App. 2007). In *V.C.,* V.C.'s mother made numerous reports to child protective services

that V.C.'s father had sexually abused V.C. *Id.* V.C.'s mother regularly examined V.C.'s genitalia after visits with V.C.'s father and "spent several years coaching V.C. to fabricate molestation allegations against [V.C.'s father]." *Id.* at 173 and 181. Based on this evidence, the trial court determined that V.C. was a CHINS. *Id.* at 171. We upheld the trial court's determination, noting that:

[V.C.'s mother] has engaged in a pattern of behavior with respect to [V.C.'s father's] relationship with [V.C.], which is harmful to the child's emotional and mental well-being....

\* \* \*

[O]ur review of the evidence reveals that, for several years, [V.C.'s mother] coached V.C. to fabricate allegations that [her father] was molesting her. Clearly, such behavior is harmful to V.C., and has a detrimental effect on her relationship with [her father] and his family.

*Id.* at 181.[2]

Mother now argues that unsupported allegations of emotional abuse are insufficient to show that a child's physical or mental condition has been impaired or endangered, as required to support a CHINS petition. However, as we decided in *V.C.,* a parent or guardian can endanger a child's mental condition by making multiple false sexual abuse allegations. *See id.* That principle is especially relevant in the instance case where Mother made multiple sexual molestation allegations that were

---

**2.** The four issues listed in *V.C.* are: (1) whether the trial court erred in consolidating the CHINS action with the paternity action for V.C.'s father; (2) whether the trial court erred in adjudicating V.C. as a CHINS on grounds different than those set forth in the CHINS petition; (3) whether there is sufficient evidence to support the CHINS adjudication and the custody modification; and (4) whether the

trial court erred in awarding V.C.'s father compensatory damages. Judge Riley dissented to the majority opinion based on the majority's conclusions regarding the first and second issues, but did not dispute that there was sufficient evidence to support the trial court's adjudication of V.C. as a CHINS. *See id.*

not supported by evidence, subjected R.P. and L.P. to multiple sexual abuse examinations, and failed to enroll R.P. and L.P. in ongoing therapy as recommended by DCS officials. We also do not agree with Mother's proposition that injury is a requirement to adjudicate R.P. and L.P. as CHINS. As stated above, a child may be a CHINS if his or her mental condition is *endangered.* I.C. § 31–34–1–1 (emphasis added). Accordingly, the trial court did not err in its determination that R.P. and L.P. are CHINS.

### III. *Procedural Due Process*

■ Finally, Mother contends that the trial court denied her due process by failing to issue adequate findings and conclusions in its Dispositional Order. Indiana Code section 31–34–19–10 provides that:

The juvenile court shall accompany the court's dispositional decree with written findings and conclusions upon the record concerning the following:

(1) The needs of the child for care, treatment, rehabilitation, or placement.

(2) The need for participation by the parent, guardian, or custodian in the plan of care for the child.

(3) Efforts made, if the child is a child in need of services, to:

(A) prevent the child's removal from; or

(B) reunite the child with;

the child's parent, guardian, or custodian in accordance with federal law.

(4) Family services that were offered and provided *to:*

(A) a child in need of services; or

(B) the child's parent, guardian, or custodian;

in accordance with federal law.

Because our legislature has enacted an interlocking statutory scheme governing CHINS and involuntary termination of pa-rental rights, the Indiana Supreme Court has previously held that "procedural irregularities in a CHINS proceeding, such as an absence of clear findings of fact, may be of such import that the irregularities deprive a parent of procedural due process with respect to a potential subsequent termination of parental rights." *In re N.E.,* 919 N.E.2d 102, 108 (Ind.2010).

The case that Mother cites in support of her position is *T.S.,* which states that boilerplate language is not helpful to a reviewing court and generally is not sufficient to permit appellate review. *In re T.S.,* 881 N.E.2d 1110, 1113 (Ind.Ct.App.2008). Mother argues that *T.S.* applies to the instant case because the trial court here seemed to use boilerplate language. Similarly, our decision in *A.P.* also seems to support Mother's contentions. There, Mother and Father sought review of the involuntary termination of their relationship with their minor child, A.P. *A.P. v. Porter Cnty. Office of Family and Children,* 734 N.E.2d 1107, 1109 (Ind.Ct.App. 2000). The parents claimed that the trial court had violated their due process rights because the trial court had not followed statutory requirements in the CHINS and termination proceedings. *Id.* at 1112. On appeal, we found the trial court's findings insufficient because the trial court had not given a reason for its disposition as required by I.C. § 31–34–19–10(a)(5) or a reason for A.P.'s placement in foster care. *Id.* at 1115–16.

Nevertheless, there are important distinctions between *A.P.* and the instant case. In *A.P.* we found six procedural errors in addition to the trial court's omissions in its findings of facts. *Id.* at 1117. The irregularities were so notable that we were compelled to reverse the termination of parental rights on procedural due process grounds because the "record [was] replete with procedural irregularities

throughout the CHINS and termination proceedings that [were] plain, numerous, and substantial[.]" *Id.* at 1118. We also specifically linked the "inherent increased risk of error" to the "multiplicity of procedural irregularities." *Id.* In contrast, we specified that "we [were] not convinced that any one of the [ ] irregularities by itself substantially increased the risk of error in the termination proceedings to the extent that [Phelps and Pack] were deprived of due process[.]" *Id.* Through this language, we indicated that the issue of whether a procedural violation amounts to a constitutional deprivation of due process is dependent on the factual circumstances of each given case.

In *A.I.*, we re-visited the issue of procedural due process and again indicated that one procedural violation alone may not rise to the level of a constitutional violation. *See In re A.I.*, 825 N.E.2d 798 (Ind.Ct. App.2005). In *A.I.*, the trial court entered the following findings of fact:

> Court finds that the child has a special need for care, that there is a need for treatment and rehabilitation; there is a need for participation by the parents which appears to be forthcoming; efforts made to reunite the family have been unsuccessful to date; family services offered and provided have been reasonable; child remains a child in need of services; child is made a ward of the Vanderburgh Office of Family and Children with placement [not] with the mother; this placement is [ ] the least restrictive, most appropriate, and in the child's best interest.

*Id.* at 814. We concluded that the trial court's order "while sparse, substantially [complied] with the statutory requirements. It [was] clear from the order that the trial court considered all the factors set forth in the statute." *Id.* We also reiterated that one deficiency alone may

not result in a due process violation. *Id.* at 816. In *A.I.*, unlike *A.P.*, the procedural deficiencies, if any, did not rise to the level of a constitutional violation. *Id.*

Based on our review, we conclude that the trial court's findings in the instant case did not violate Mother's right to procedural due process. Mother argues that the trial court's findings say little about (1) the needs of R.P. and L.P. for care, treatment, rehabilitation, or placement; (2) Mother's need to participate in a plan for the care of R.P. and L.P.; (3) the family services provided to Mother and/or R.P. and L.P.; or (4) how efforts to reunite R.P. and L.P. with Mother have been ineffective. We conclude, though, that as in *A.I.*, the trial court's Dispositional Order was sparse, but it is apparent that the trial court did consider the elements required by I.C. § 31–34–19–10.

The trial court stated that (1) the children will continue to receive visitation with Mother, therapy, and schooling; (2) participation by Mother in the plan of care for the children is necessary for reunification; (3) remaining in the home of Mother would be contrary to the welfare of the children because the children need protection; and (4) that

> reasonable efforts to prevent or eliminate removal of the children were not required due to the emergency nature of the situation, as follows: immediate removal of the children was necessary in order to protect the children. Mother made accusations about [Father] which the children denied. Mother failed her stress test when asked specific questions about making up sexual abuse allegations.

(Appellant's App. pp. 208–10). These findings illustrate that even if the trial court amended a boilerplate form, the trial court made the form specific to Mother's case and addressed the elements required by

I.C. § 31–34–19–10. We also conclude that even though the trial court mentioned Mother's failed .stress test in its Dispositional Order, which contradicts the trial court's prior Order granting Mother's motion and amended motion to exclude the voice stress test results, that error was harmless. The trial court's finding that "Mother made accusations about [Father] [that] the children denied" was sufficient to justify the emergency nature of the situation, and the reference to the voice stress test results was extraneous. (Appellant's App. p. 210).

Moreover, the threat to Mother's due process rights is low here. Mother does not allege any additional procedural violations, and it is not apparent that the trial court's reasoning is missing from the record. In its Order declaring R.P. and L.P. CHINS, the trial court made six substantial findings regarding the facts of this case, and the basis for the trial court's judgment is clear based on these findings. In addition, we held in *A.P.* that there is a greater risk of a constitutional violation when a child is placed outside of the home as a result of a CHINS hearing because such a placement logically indicates an increase in the possibility that there will be a subsequent termination of parental rights. *A.P.*, 734 N.E.2d at 1116. By extension, the risk to Mother's parental rights towards R.P. and L.P., who have been placed with Father, is lower. In light of the language of the trial court's Dispositional Order and the low risk of violating Mother's constitutional rights, we find that the trial court's findings were sufficient to afford Mother procedural due process.

### CONCLUSION

Based on the foregoing, we conclude that (1) the trial court had jurisdiction even though the trial court failed to conduct a factfinding hearing within the 60–day statutory time limit; (2) DCS present-

ed sufficient evidence to prove by a preponderance of the evidence that R.P. and L.P. are CHINS; and (3) the trial court did not deny Mother due process.

Affirmed.

DARDEN, J., and BARNES, J., concur.