# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
May 24 2018, 6:24 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Danielle L. Gregory
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Frances Barrow
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE CHILD
ADVOCATES, INC.

DeDe Connor
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of A.K., A Child in Need of Services, | May 24, 2018 |
| N.K., Father, | Court of Appeals Case No. 49A05-1711-JC-2658 |
| *Appellant-Respondent,* | Appeal from the Marion Superior Court |
| v. | The Honorable Marilyn A. Moores, Judge |
| Indiana Department of Child Services, | The Honorable Jennifer Hubartt, Magistrate |

*Appellee-Petitioner,*

and

Child Advocates, Inc.,
*Appellee-Guardian Ad Litem.*

Trial Court Cause No.
49D09-1707-JC-2334

**Kirsch, Judge.**

N.K. (Father) appeals from the juvenile court's order adjudicating A.K. ("Child") to be a child in need of services ("CHINS"). Father raises the following restated issue for our review: whether there was sufficient evidence presented to support the CHINS adjudication.

We affirm.

## Facts and Procedural History

Father and P.A. ("Mother") are the parents of Child, and the marriage between Father and Mother was dissolved in 2012. At that time, Father was granted sole legal and physical custody of Child, and Mother was granted parenting time. At all pertinent times of this case, Mother was incarcerated and not able to care for Child. In July 2017, Father and Child, who was six years old at the time, were living in the home of Father's father ("Grandfather") and Father's mother ("Grandmother") (together "Grandparents").

[4] On July 14, 2017, Indianapolis Metropolitan Police Department Officer Frank Vanek ("Officer Vanek") was dispatched to an address on English Avenue in Marion County on a 911 call involving Father and a disturbance between family members. As Officer Vanek pulled up to the residence, he saw a white male, who was later identified as Father, running down the sidewalk and frantically waving in an attempt to flag the officer down. When Officer Vanek spoke to Father, he noticed that Father was sweating profusely. Father told Officer Vanek that he had "caught six-year-old [Child] in bed in between [Grandmother] and [Grandfather]" and that Grandfather had molested Child. *Tr. Vol. II* at 23.

[5] The longer Officer Vanek was on the scene, the more uneasy he felt about Father because Father was sweating profusely, his pupils looked like "pin needles," his behavior was extremely erratic, and he was jumping around. *Id.* at 35. At one point, Father wanted to leave the scene and cross the street to get a cell phone. *Id.* Officer Vanek's training caused him to believe that Father's behavior was related to drug use. *Id.* at 36. Father told Officer Vanek that he used meth approximately four days prior and had used it five times in the past. *Id.* at 24. Father stated he only used meth when he was drunk because he did not like the way it tasted. *Id.*

[6] As a result of Officer Vanek's investigation into the family disturbance, he placed Father under arrest for battery on Grandmother, and the associated criminal case was pending at the time of the fact-finding hearing in this case. *Id.* While Officer Vanek was present at the residence, Father and the

Grandparents continued to argue in Child's presence. *Id.* at 24, 32. Officer Vanek did not feel comfortable leaving Child alone with Grandparents due to Father's earlier allegations, so Officer Vanek called the Indiana Department of Child Services ("DCS"). *Id.* at 33.

[7] Family Case Manager ("FCM") Korrie Frick ("FCM Frick") arrived at the residence in response to Officer Vanek's call. She spoke with Father at the scene and asked him to submit to a drug screen at that time, but he refused. *Id.* at 40. Child was removed from the home and placed in foster care. *Id.* Four days later, on July 18, 2017, DCS filed a petition alleging that Child was a CHINS. At the initial/detention hearing, which was held the same day, the juvenile court appointed a guardian ad litem and ordered Child to remain in foster care.

[8] A fact-finding hearing on the CHINS petition was held on September 6, 2017. At the hearing, testimony was presented about the incident that precipitated the removal of Child from Father's care. During the time the petition was pending, Father had supervised visitation with Child. The original visitation supervisor facilitated only one visit with Child and Father because the supervisor stated he was not comfortable with Father due to the fact that Father kept asking to see the supervisor's case notes and recorded the supervisor on his phone. *Id.* at 50. However, the second visitation supervisor testified that Father's visits with Child went well and that Father was attentive to Child's needs, responded appropriately to Child's concerns and needs, had activities planned, displayed

appropriate behavior, exhibited the ability to protect Child, and appeared to have a bond with Child. *Id*. at 45-47.

[9] Father testified that he wanted Child to live with him, although he had never lived with Child on his own and been the sole caregiver. *Id*. at 77. At the time of the hearing, Father testified that he was living in a friend's home and had been doing so for about two weeks. *Id*. at 66-67. While testifying about his residence, Father faltered and said "Oh, sometimes – I got so much . . . on my mind I – all this just trying to . . . ." *Id*. at 73. Father then testified that he was "going to be l[i]ving with [his] girlfriend now" and would start living with her, as well as her two daughters, the day of the hearing. *Id*. at 73-74, 76. When asked why he had testified that he was living with a friend when he actually planned to move in with his girlfriend, Father said "You asked me where I was living if I'm not mistaken. I got so much on my mind you know if you understood." *Id*. at 76. Father also testified that he was employed and had been working at that job for about two weeks at the time of the hearing. *Id*. at 63-64.

[10] There was also testimony that, at the time of the hearing, Child had been meeting with a therapist since the beginning of the CHINS case. Child's therapist stated that she met with Child twice a week and that it would be helpful for Child to continue therapy in the future. *Id*. at 54, 58. Although Father did not have health insurance for Child, he testified that he would obtain therapy for Child. *Id*. at 75.

FCM Kierra Swygert ("FCM Swygert"), who had been assigned to the case since July, testified that as part of the CHINS matter, she had referred Child to home-based therapy and had referred supervised visitation for Child and Father. *Id*. at 80. FCM Swygert also referred Father for Father Engagement services, but he declined to participate. *Id*. at 80. FCM Swygert also recommended that Father submit to random drug screens. *Id*. at 80-81.

After taking the case under advisement, the juvenile court issued an order on October 2, 2017, which adjudicated Child to be a CHINS. The juvenile court found that Child was a CHINS because her mental and physical condition was seriously impaired and endangered as a result of the inability, refusal, and neglect of Mother and Father to provide Child with food, clothing, shelter, medical care, education, and supervision due to Mother being incarcerated and unable to provide for or parent Child and due to Father engaging in drug use and domestic violence in the presence of Child while she was in his care, custody, and control. *Appellant's App. Vol. II* at 123-24. The juvenile court further found that Child needed care, treatment, or rehabilitation, including her therapy, that she will not receive or is unlikely to receive without the coercive intervention of the juvenile court. *Id.* at 124. Father now appeals.

## Discussion and Decision

CHINS proceedings are civil actions, and therefore, it must be proven by a preponderance of the evidence that a child is a CHINS as defined by statute. *In re L.C.*, 23 N.E.3d 37, 39 (Ind. Ct. App. 2015) (citing *In re N.E.*, 919 N.E.2d

102, 105 (Ind. 2010)), *trans. denied*. When we review a CHINS determination, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id*. We consider only the evidence that supports the juvenile court's decision and the reasonable inferences drawn therefrom. *Id*. at 39-40. Where the trial court issues findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.P.*, 949 N.E.2d 395, 400 (Ind. Ct. App. 2011). We consider first whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id*. "Findings are clearly erroneous only when the record contains no evidence to support them either directly or by inference." *K.B. v. Ind. Dep't of Child Servs.*, 24 N.E.3d 997, 1001-02 (Ind. Ct. App. 2015) (citation omitted). "A judgment is clearly erroneous if it relies on an incorrect legal standard." *Id*. at 1002.

[14]  Father argues that the juvenile court erred when it found that Child was a CHINS because there was not sufficient evidence to support such a determination. Father asserts that there was no evidence presented that Child's physical or mental condition was seriously impaired or endangered as a result of his inability, refusal, or neglect to supply Child with the necessary food, clothing, shelter, medical care, education, or supervision. Father maintains that at the time of the fact-finding hearing, he had housing, employment, food, and medical care for Child. He also claims that there was no indication that he used drugs in Child's presence or that any drug use impaired his ability to care for

Child or threatened her safety. Father further contends that there was no evidence that the coercive intervention of the juvenile court was necessary because Child was unlikely to receive needed care, treatment, or rehabilitation.

[15] DCS had the burden of proving by a preponderance of the evidence that Child was a CHINS. Ind. Code § 31-34-12-3. Indiana Code sections 31-34-1-1 through 11 specify the elements of the CHINS definition that the State must prove:

> (1) the child is under the age of 18;
>
> (2) one or more particular set or sets of circumstances set forth in the statute exists; and
>
> (3) the care, treatment, or rehabilitation needed to address those circumstances is unlikely to be provided or accepted without the coercive intervention of the court.

*In re N.E.*, 919 N.E.2d at 105. Here, the juvenile court adjudicated Child to be a CHINS pursuant to Indiana Code section 31-34-1-1, which provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Therefore, this statute requires "three basic elements:  that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and . . . that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[16] Initially, Father challenges two of the juvenile court's findings, arguing that the evidence did not support the two findings.  Finding 24 stated, "Following her interviews at the scene and the arrest of [Father], FCM Frick placed [Child] in the care of [Grandparents]."  *Appellant's App. Vol. II* at 122.  Finding 33 stated, "[Father] has never resided alone with [Child].  Since being placed in the custody of [Father], [Child] has always resided with [Grandparents]."  *Id.* at 123.  Assuming without deciding that these finding were not supported by the evidence, they were not the basis of the juvenile court's CHINS determination.  The juvenile court based its determination on Father's drug use and domestic violence in the presence of Child.  *Id.* at 124.

[17] Father does not challenge the sufficiency of the evidence to support any of the other findings by the juvenile court.  As Father does not challenge any of the remaining findings of facts by the juvenile court, these unchallenged facts stand as proven.  *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the

findings were clearly erroneous), *trans. denied; McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when father failed to challenge specific findings, court accepted them as true).

[18] Father next contends that the findings do not support the trial court's conclusions. The trial court made the following pertinent conclusions in its order finding Child to be a CHINS:

> 3. [Child] is a child in need of services because her mental and physical condition is seriously impaired and endangered as a result of the inability, refusal, and neglect of [Mother] and [Father] to provide the child with food, clothing, shelter, medical care, education, and supervision.
>
> . . . .
>
> 5. [Father] has engaged in drug use and domestic violence in the presence of the child and while the child was in his care, custody, and control.
>
> 6. [Child] needs care, treatment, or rehabilitation, including twice weekly individual therapy, that she will not receive or is unlikely to receive without the coercive intervention of the Court.

*Appellant's App. Vol. II* at 123-24.

[19] The evidence presented at the fact-finding hearing showed that the police were called to Grandparents' home, where Father and Child were living at the time, on July 14, 2017 on a report of a disturbance between family members. When Officer Vanek encountered Father, he observed Father to be sweating profusely,

to have pinpoint pupils, to be acting erratically, and to not be able to give any specific information about the alleged molestation of Child by Grandfather. *Tr. Vol. II* at 35. At one point, Father attempted to leave the scene to get a cell phone. *Id.* Due to his training, Officer Vanek believed that Father's behavior was related to drug use.[1] *Id.* at 36. Father told Officer Vanek that he used meth approximately four days prior and had used it five times in the past, but that he only used meth when he was drunk because he did not like the way it tasted. *Id.* Child was present for all of this. Based on the information Officer Vanek obtained concerning the family disturbance between Father and Grandparents, Father was arrested for battery on Grandmother at that time. *Id.* at 24, 33. Because of Officer Vanek's uneasiness about leaving Child in Father's care because of his behavior and about leaving Child with Grandparents due to the allegations by Father, Officer Vanek called DCS. FCM Frick arrived at the scene and requested that Father submit to a drug screen, which he refused. Child was then removed from the home.

[20] Evidence was also presented that, as a part of the CHINS case, DCS referred Father for Father Engagement services, random drug screens, and supervised visitation with Child. Father declined to participate in Father Engagement

---

[1] Father's reliance of *Perrine v. Marion County Office of Child Services*, 866 N.E.2d 269 (Ind. Ct. App. 2007), which held that a single instance of drug use outside the presence of the child was insufficient for a CHINS finding, is misplaced. *Id.* at 276. Here, it was not Father's drug use alone that formed the basis of the CHINS finding. The juvenile court based its determination not only on Father's drug use, but also on Father's act of domestic violence in the presence of Child and Father's erratic demeanor and unclear housing situation and ability to obtain therapy for Child. *Appellant's App. Vol. II* at 121-24.

services. At the time of the fact-finding hearing, Father did not have stable housing for himself and Child. He testified that, as of the date of the hearing, he was living in a friend's home and had been doing so for about two weeks. *Id*. at 66-67. Father then testified that he was going to be living with his girlfriend and her two daughters and planned to begin doing so the day of the hearing. *Id*. at 73-74, 76. When asked about this discrepancy in living arrangements, Father said "You asked me where I was living if I'm not mistaken. I got so much on my mind you know if you understood." *Id*. at 76. Father also testified that he was employed, but had only been working at that job for about two weeks. *Id*. at 63-64. Father also had no health insurance coverage for Child at the time of the hearing, nor did he have any plans for daycare or after school care for Child. *Id*. at 77. The evidence showed that Father had never resided alone with Child. *Id*. Testimony from Child's therapist established that she met with Child twice a week, and the therapist stated that Child should continue therapy in the future. *Id*. at 54, 58. Although Father testified that he would obtain therapy for Child, he did not have health insurance for Child, and it was not clear that she would receive her therapy without court intervention. *Id*. at 75.

[21] Additionally, the juvenile court found that Father's statements and demeanor at the fact-finding hearing were observed to be scattered and erratic and raised serious concerns regarding Father's ability to parent a six-year-old child at that time. *Appellant's App. Vol. II* at 123. While testifying about living with his friend, Father faltered and said "Oh, sometimes – I got so much . . . on my

mind I – all this just trying to . . . ." *Tr. Vol. II* at 73. During the fact-finding hearing, the juvenile court found that Father often sobbed or stared blankly at the lawyers during his direct and cross examinations, then would abruptly change his demeanor. *Appellant's App. Vol. II* at 123.

[22] We, therefore, conclude that sufficient evidence was presented at the fact-finding hearing to establish that Father was unable or refused to supply Child with necessary food, clothing, shelter, medical care, education, or supervision, and Child's physical or mental condition was seriously impaired or seriously endangered as a result and that Child needed care, treatment, or rehabilitation that she was not receiving and was unlikely to be provided without the coercive intervention of the court. *See* Ind. Code § 31-34-1-1. Sufficient evidence supported the juvenile court's determination that Child was a CHINS.

[23] Affirmed.

[24] Baker, J., and Bradford, J., concur.