# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 06 2020, 11:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kara E. Krothe
Monroe County Public Defender's Office
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of S.C., Kad.C., and Kai.C., Children in Need of Services, <br><br> K.C., Mother, and J.C., Father <br><br> *Appellants-Respondents,* <br><br> v. <br><br> Indiana Department of Child Services <br><br> *Appellee-Petitioner.* | August 6, 2020 <br><br> Court of Appeals Case No. 19A-JC-2926 <br><br> Appeal from the Monroe Circuit Court <br><br> The Honorable Stephen R. Galvin, Judge <br><br> Trial Court Cause Nos. 53C07-1906-JC-313 53C07-1906-JC-314 53C07-1906-JC-315 |

**Kirsch, Judge.**

[1] K.C. ("Mother")[1] appeals from the juvenile court's order adjudicating S.C., Kad.C., and Kai.C. (collectively, "the children"), to be children in need of services ("CHINS"). Mother raises two issues for our review:

    I.    Whether the Indiana Department of Child Services ("DCS") failed to present sufficient evidence to support the juvenile court's CHINS adjudication; and

    II.    Whether the trial court abused its discretion in ordering Mother to complete a psychological assessment and a gun safety course.

[2] We affirm.

## Facts and Procedural History

[3] J.C. ("Father") and Mother have three children: S.C., born July 22, 2009, Kad.C., born June 29, 2010, and Kai.C., born June 11, 2011. *Tr. Vol. 2* at 185. Father works as a gunner mate for the Navy and is currently stationed at Crane Naval Base in Indiana. *Id.* at 52, 89. His job involves obtaining and implementing new weapons, and he is qualified to run a shooting range. *Id.* Mother is Filipino, and her side of the family lives in California. *Id.* at 163, 182.

---

[1] Father is not participating in this appeal. However, because he is a party of record in the trial court, he is a party on appeal. *See* Ind. Appellate Rule 17(A).

On March 10, 2019, Mother came home from work and found Father intoxicated. *Id.* at 168. They began to argue while the children were playing upstairs. *Id.* Mother left and went to the home of M.C., who is a friend of Father's and a coworker at the Navy. *Id.* at 57. At around 7:00 p.m., Mother showed up at M.C.'s home crying and very upset. *Id.* Mother told him that Father was drunk and asked him to come to her house to distract Father. *Id.* Mother also told him that Father had been physically violent toward her on several occasions in the past. *Id.* at 60. One of those occasions happened on a family trip to North Carolina. *Id.* at 61. The children were sharing a hotel room with the parents. *Id.* One night, Father returned from a bar already drunk and angry. *Id.* He began to argue with Mother and eventually pulled out a gun and a knife. *Id.* Father demanded Mother pick up the gun. *Id.* Mother refused because she was worried that Father would kill her and have an excuse of self-defense. *Id.* Father then traced the knife down her thigh to scare her into picking up the weapon. *Id.* Their daughter started crying, and soon their sons woke up and also started crying. *Id.* at 62. Mother told M.C. that Father got angry with the boys and stuffed the gun in the stomach of one of the boys and yelled at them to get them to be quiet. *Id.*

Another incident that Mother told M.C. about also happened in North Carolina. *Id.* at 65. Mother said that she had a man who was going to help her get away from Father. *Id.* When Father came home and saw the man, he pointed a gun at them and forcefully ejected both the man and Mother from the house. *Id.* at 65, 137. A third incident that Mother described to M.C. took

place in Indiana. *Id*. at 64. One day, Father came home angry, and Mother was in the kitchen with their daughter in her arms. *Id.* Mother said that she thought about using the daughter as a shield so that Father would not harm her. *Id.* Mother told M.C. that Father throat chopped her to the point that she was gasping for air. *Id.* Father then pinned her against the floor to inflict pain on her, and she suffered nerve damage in one of her hands from the attack. *Id.*

[6] Throughout their conversation, M.C. observed that Mother was "very frightened" both for herself and for the children. *Id.* at 58. While Mother insisted that she did not want to get Father in trouble, M.C. explained that he is required to report these incidents to the Navy. *Id.* About two hours later, M.C. drove Mother to the home of her friend L.M.L. and went to see Father by himself. *Id.* at 65, 92.

[7] When M.C. arrived at the family home on the evening of March 10, 2019, he knocked on the door and rang the doorbell for fifteen minutes, but no one answered. *Id.* at 93. Eventually, the two sons opened the door and let him in. *Id.* at 65. M.C. saw that Father was passed out in a rocking chair. *Id.* at 65. There was a pistol on a shelf to the right of Father's chair, which was within the children's reach. *Id.* at 67-73. M.C. later discovered that the pistol had a bullet in the chamber. *Id.* at 104; *DCS Exs.* 4-11. At the fact-finding hearing, M.C. further testified that Father had multiple pistols inside the home. *Id.* at 105. When Father was awakened by M.C., he was "very confused" and "obviously intoxicated." *Id*. Father got very angry at the boys for letting M.C. into the house. *Id.* M.C. observed that the boys appeared frightened. *Id.* at 65, 67.

[8]     Mother returned to the family home about an hour after M.C. arrived. *Id.* at 66. M.C. testified that Father began to argue with Mother and accused her of cheating on him because she came home late. *Id.* at 73. Mother tried to explain to Father that she was home earlier and only left because she did not want their argument to escalate. *Id.* Father did not believe her and called the children down to confirm her story. *Id*. at 73-74. After being questioned by Father, two of the children went back upstairs to sleep, but one stayed downstairs. *Id.* at 74. When Father was trying to point out a hole that he had made in the wall and explain it to Mother, the son that had stayed pointed it out before Father. *Id.* Father then "cupped" his son upside the head and called him "a fucking bitch." *Id.* M.C. saw that the son had tears in his eyes. *Id.* Father also yelled at the son again before the boy went upstairs to bed. *Id.* After the children had all gone upstairs, the argument between Father and Mother worsened. *Id.* Father again accused Mother of cheating on him. *Id.* at 74-76. Father told M.C. that he had been accused of pistol-whipping Mother in North Carolina. *Id.* at 76. Father then picked up the pistol that was on the shelf, unloaded it, and showed the gun to Mother, saying that "this gun has no blemish on it, no blood on it, it's in pristine condition, [and it] hasn't been cleaned since North Carolina, so it couldn't have been used to do anything in North Carolina." *Id.* Father then reloaded the gun and placed it back on the television stand, which was its usual location. *Id.*

[9]     As required by the Navy, M.C. reported the March 10 incident and the previous incidents that Mother had told him about to Father's command. *Id.* at 100-01.

As a result, a thirty-day military protective order was placed on Father, which required him to leave the family home and keep a 1000-feet distance away from Mother and the children. *Id.* at 98. Father testified at the hearing that he had complied with the military protective order and had no contact with Mother and the children during the thirty-day period. *Id.* at 212. M.C. also tried to set up a meeting for Mother to talk to the Naval Criminal Investigation Service ("NCIS"). *Id.* at 87. However, Mother refused. *Id.* at 85, 87.

[10] In addition to M.C., Mother reached out to her friend L.M.L. about Father's violence against her in the past. *Id.* at 134-38. On March 7, 2019, Mother told L.M.L. that she was not ready to leave Father because she didn't have enough resources. *Id.* at 139. She was also worried that Father would lose his job, and the children would no longer have military benefits. *Id.*

[11] On the evening of March 10, when M.C. drove Mother to L.M.L.'s house, L.M.L. saw that Mother was crying and shivering due to anxiety. *Id.* at 139-40. Mother told L.M.L. about her fight with Father and that she was scared because she couldn't predict how Father's violence would progress in the future. *Id.* L.M.L. testified that she proposed that Mother bring the children over to spend the night. *Id.* at 140. Mother declined because she was afraid that Father would get angrier if he were to wake up in the morning, and they were not home. *Id.*

[12] L.M.L. also testified that she spoke with Mother over the phone on March 12, 2019. *Id.* at 140. Mother was crying because she was anxious about the

protective order on Father and worried that Father was going to lose his job. *Id.* Her mother-in-law had been pressuring her to provide a character reference to the Navy for Father to pass the security clearance. *Id.* at 140-41. While Mother attempted to hold back, and L.M.L. had advised her not to provide the letter if it was not the full truth, she eventually relented and wrote one. *Id.* at 141.

[13] On March 22, 2019, Mother, L.M.L., and another friend met at a local grocery store. *Id.* Mother explained that she did not want to meet at home because Father had surveillance cameras and microphones inside and could listen to their conversation. *Id.* at 142. She also asked them to communicate with her only through Facebook messenger because Father would track her activities on her phone. *Id.* L.M.L. testified that at the grocery store, Mother stated that she was ready to file for a divorce for her own safety and the safety of the children. *Id.* at 142. During the time of the protection order, L.M.L. and her friend helped Mother with transportation and groceries because Mother had no access to the family's bank account, which was controlled by Father. *Id.* When L.M.L. told Mother that she had reported Mother's stories to the Indiana Department of Child Services ("DCS"), Mother got upset because she didn't want the DCS to intervene. *Id.* at 140, 143. L.M.L. testified that Mother started to make excuses for Father and stated that on March 10, he pulled her hair only because he was drunk. *Id.* at 143. Mother eventually stopped her communication with L.M.L. by end of May in 2019. *Id.*

[14] On March 15, 2019, which was within the duration of Father's military protective order, DCS received a report against Father for child neglect. *Id.* at 148. After DCS became involved, Family Case Manager ("FCM") Stephanie Clephane ("FCM Clephane") made an unannounced visit on March 17, 2019. *Id.* Mother let her in and was willing to discuss the neglect allegation. *Id.* at 148-49. Mother cried when she was telling FCM Clephane about the protective order because she wanted Father to come home. *Id.* at 149. During FCM Clephane's initial assessment, Mother admitted that Father had a drinking problem, but she denied that Father ever hit her. *Id.* FCM Clephane testified that Mother appeared to be very careful with words. *Id.* Mother kept stating that everything was blown out of proportion, and that "this was not a big deal." *Id.* FCM Clephane also asked Mother about having a knife and guns in the house. *Id.* at 151. Mother said that she did not want to discuss them because "those things happened a long time ago." *Id.* Mother further stated that she "liked having the gun in the home" because she "felt protected by it." *Id.* FCM Clephane tried to bring up the knife issue again, but Mother dismissed it and said that they were past that now. *Id.*

[15] FCM Clephane then asked to speak with the children in private. *Id.* Mother allowed it, but when FCM Clephane was talking to each child, Mother stood behind FCM Clephane to make her presence known. *Id.* at 152. FCM Clephane testified that the children seemed extremely guarded and would whisper things under their breath. *Id.* at 153. FCM Clephane believed that they did not feel like they could share their concerns. *Id.*

[16]     After the initial assessment by FCM Clephane, the case was assigned to FCM Brittany Lawrence ("FCM Lawrence"). *Id.* at 156. FCM Lawrence testified that when they first talked over the phone, Mother was emotional and was "crying off and on," saying that she was "still processing things" and did not know what to do. *Id.* at 157. Regarding the children, Mother told FCM Lawrence that their youngest child Kai.C. was having trouble sleeping at night, and the middle child Kad.C. was having behavioral problems at school. *Id.* On May 20, 2019, FCM Lawrence made an unannounced visit to the family home. *Id.* Mother told FCM Lawrence that she did not know what to do. *Id.* at 165-66. She stated that she did not like Father to drink so much and how he behaved when he was drunk. *Id.* Mother also told FCM Lawrence about Father having affairs and accusing Mother of not loving him. *Id.* At one point, Mother asked FCM Lawrence whether she herself was the reason that Father was behaving in such ways, and whether she was a good enough wife. *Id.* At the fact-finding hearing, FCM Lawrence described Mother as "very vulnerable and kind of shrunken in." *Id.* When Mother got emotional during the conversation, her body language became very frightened and scared as if she could not control it. *Id.* FCM Lawrence testified that Mother's reactions were typical of a victim of domestic violence. *Id.*

[17]     Mother had expressed her interest to both FCM Clephane and FCM Lawrence in receiving counseling for herself and the children. *Id.* at 151, 158. FCM Lawrence testified that DCS had made those referrals for her to Centerstone, including a substance abuse evaluation for Father, individual therapy for

Mother, and an evaluation for the children. *Id.* at 179. The DSC also attempted to inform the parents about what those services entailed and asked what kind of services the parents would want. *Id.* However, until the fact-finding hearing on July 8, 2019, the parents had not completed the evaluations or contacted DSC to inquire about those services or about their case. *Id.* On November 4, 2019, the day of the dispositional hearing, Mother eventually completed her counseling assessment. *Tr. Vol. 3 at 40*

[18] On May 22, 2019, the case was assigned to its current case manager, FCM Jake Parker ("FCM Parker"). *Id.* at 198. On June 19, FCM Parker made an unannounced visit to see the children. *Id.* Mother asked FCM Parker to wait while she asked for permission from Father and Father's lawyer. *Id.* at 199-200. When Father could not reach his lawyer, Mother asked FCM Parker to leave. *Id.* at 200. However, she called FCM Parker shortly after and told him that he could see the children. *Id.* FCM Parker returned, but he was only allowed to watch the children play from the entryway at the door. *Id.* Mother videotaped FCM Parker's visit and did not allow him to converse with the children. *Id.* When the Court Appointed Special Advocate Julie Gerstorff ("CASA Gerstorff") visited the children with her supervisor on July 30, 2019, Mother allowed the interview, but the eldest child, S.C., at first, hid in the bathroom and did not want to come out. *Id.* at 207-08.

[19] On June 11, 2019, DCS filed a verified petition alleging the children to be CHINS. *Appellant's App. Vol. 1 at 23.* DCS alleged that Father was domestically violent in front of the children, that Father has a substance abuse

problem, that Father has pending criminal charges against him for the incident on March 10, 2019, that the children appeared to have been coached not to talk about the family, and that the family refused an informal adjustment. *Id.* at 24.

[20] On August 7, 2019, the juvenile court heard evidence on DCS's petition and found the children to be CHINS. *Appellant's App. Vol. 1* at 32-37; *Tr. Vol. 2* at 49. The juvenile court ordered both parents to ensure that all firearms were locked in a safe place at all times. *Appellant's App. Vol. 1* at 39. Among other things, the juvenile court also ordered Mother to complete a psychological assessment and a gun safety course. *Id.* at 40. Mother now appeals.

## Discussion and Decision

## I. Sufficiency of the Evidence

[21] Mother alleges that the DCS failed to present sufficient evidence to prove that the children are CHINS. Where the trial court issues findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.P.*, 949 N.E.2d 395, 400 (Ind. Ct. App. 2011). We consider first whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id*. We neither reweigh evidence nor reassess witness credibility when we review the trial court's findings. *Id.* Instead, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. *Id.* "Findings are clearly erroneous only when the record contains no

evidence to support them either directly or by inference." *K.B. v. Ind. Dep't of Child Servs.*, 24 N.E.3d 997, 1001-02 (Ind. Ct. App. 2015) (citation omitted). "A judgment is clearly erroneous if it relies on an incorrect legal standard." *Id.* at 1002.

[22] A CHINS proceeding is a civil action, and it must be proven by a preponderance of the evidence that a child is a CHINS as defined by statute. *In re L.C.*, 23 N.E.3d 37, 39 (Ind. Ct. App. 2015) (citing *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010)), *trans. denied*. Indiana Code sections 31-34-1-1 through 11 specify the elements of the CHINS definition that the State must prove:

> (1) the child is under the age of 18;
>
> (2) one or more particular set or sets of circumstances set forth in the statute exists; and
>
> (3) the care, treatment, or rehabilitation needed to address those circumstances is unlikely to be provided or accepted without the coercive intervention of the court.

*In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). In the current case, the trial court adjudicated the children to be CHINS pursuant to Indiana Code section 31-34-1-1, which provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or

neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[23] The Indiana Supreme Court has established that this statute requires "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and . . . that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d, 1283, 1287 (Ind. 2014). "A CHINS finding cannot be entered if the 'coercive intervention' element is unproven." *In re E.K.*, 83 N.E.3d 1256, 1261 (Ind. Ct. App. 2017), *trans denied*.

[24] On appeal, Mother argues that the DCS failed to prove the "coercive intervention" element by sufficient evidence to support the juvenile court's CHINS adjudication. *Appellant's Br.* at 12-17. Specifically, Mother contends that the juvenile court's intervention is not necessary to ensure that she would provide a safe home and mental care for the children because (1) she had already cooperated with DCS services and Father would cooperate with whatever the Navy ordered him to do in the future; (2) she and Father had not reported any incidents of violence due to alcohol use since March 10, 2019; and (3) she and Father had been following DCS's safety plan which requires them

to separate themselves before any argument escalates and to not expose the children to any form of violence. *Id.* Mother's argument is a request for us to reweigh the evidence, which we cannot do. *In re R.P.*, 949 N.E.2d at 400.

[25] Parents have a fundamental right to raise their children without undue influence from the State. *G.B. v. Dearborn*, 754 N.E.2d 1027, 1032 (Ind. Ct. App 2001), *trans. denied*. However, that right is limited by the State's compelling interest in protecting the welfare of the children. *Id.* Therefore, the focus of the CHINS proceeding is on the condition of the children and whether they have needs that the parents are unable or unwilling to meet, creating a need for court intervention. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). CHINS statutes do not require that a court wait until a tragedy occurs to intervene. *Roark v. Roark,* 551 N.E.2d 865, 871 (Ind. Ct. App. 1990). Once the juvenile court concludes that a parent's actions or omissions have created a CHINS condition, the court may infer that such actions and conditions would continue in the absence of court intervention. *In re M.R.,* 452 N.E.2d 1085, 1089 (Ind. Ct. App. 1983).

[26] The evidence presented at the fact-finding hearing revealed that Father has a history of domestic violence. Mother repeatedly failed to protect the children in dangerous situations and left them with Father when he was intoxicated and in possession of firearms. When the parents had a fight during their vacation in North Carolina, Father pointed a gun at one child while Mother was present. *Tr. Vol. 2* at 62. On another occasion, Father got upset seeing Mother with a man at their home, Mother was escorted out at gunpoint, and the children were left alone with Father. *Id.* at 137. On March 10, 2019, after having a fight with

Father at their home, Mother left the house because she was worried about her own safety and the safety of the children. *Id.* at 139. However, the children were left at home with Father, who was extremely intoxicated and later passed out in a rocking chair with a loaded gun on the shelf nearby within the children's reach. *Id.*

[27] Evidence was also presented that supported the trial court's finding that Mother failed to participate in the services provided by DCS or to cooperate with the NCIS investigation. *Appellant's App. Vol II* at 36. While Mother stated that she felt that the children could benefit from counseling, she never took the children to complete the evaluation that was referred by DCS. *Id.* at 151, 158, 180. Mother herself also failed to participate promptly in her own evaluations. *Id.* at 178-80. From March 2019 to November 2019, Mother did not voluntarily set up any appointment or inquire about the counseling services. *Id.* She waited six months until the day of the dispositional hearing to finally complete her first evaluation. *Tr. Vol. 3* at 40.

[28] Further evidence was presented that Mother did not cooperate with the NCIS and DCS investigations voluntarily. She refused to speak with an NCIS investigator about Father. *Tr. Vol. 2* at 87. Mother was upset when she learned that L.M.L. had reported Father's violent behavior at home to the DCS. *Id.* at 143. Mother started to find excuses for Father's violence at home and soon stopped communicating with L.M.L.. *Id.* Mother also prevented the children from talking freely to the FCMs. During FCM Clephane's initial assessment, Mother stood behind FCM Clephane so that the children could see her when

they were talking to FCM Clephane. *Id.* at 152-53. FCM Clephane testified that she believed Mother's presence made the children unable to speak freely. *Id.* When FCM Parker made an unannounced visit to talk to the children, Mother refused and asked FCM Parker to wait before getting permission from Father and Father's lawyer. *Id.* at 199-200. Although within an hour Mother called back and allowed FCM Parker to see and talk to the children very briefly, she did not allow FCM Parker to have a conversation with them. *Id.* at 200. Mother also videotaped FCM Parker's visit. *Id.*

[29] Despite Father's violent behavior at home, Mother continued to support him and was unwilling to get help. Mother wanted the military protective order against Father to be lifted so that Father could come home. *Id.* at 149. She referred to the March 10 incident as "not a big deal" to FCM Clephane. *Id.* During the no contact order, Mother wrote a character reference for Father so that he could pass security clearance for his job with the Navy. *Id.* at 140-41. Mother believed that she was the reason that Father was acting violent at home. *Id.* at 166. She was reluctant to leave Father because she did not have enough resources and wanted the children to continue to have military benefits. *Id.* at 139.

[30] Collenn Yeakle ("Yeakle") is a specialist in domestic violence who testified at the fact-finding hearing that domestic violence harms children even when they do not see the physical violence itself. *Id.* at 108, 123. Children can sense it is going on and recognize the conditions of control that the perpetrator exercises over the victim. *Id.* Yeakle explained that domestic violence often leads to

childhood depression, anxiety, and post-traumatic stress disorder. *Id.* The evidence presented at the fact-finding hearing demonstrated that Mother was either unable or unwilling to appreciate the trauma to her children caused by the violence present in the home. We, therefore, conclude that court intervention was necessary to protect the physical and mental health of the children.

[31] Because Mother does not challenge the other two elements of a CHINS finding that the parents' actions or inactions have seriously endangered the children and that the children's needs for care, treatment, or rehabilitation are unmet, we conclude that the juvenile court properly determined the children to be CHINS.

## II. Abuse of Discretion

[32] Mother alleges that the trial court abused its discretion in its dispositional order by requiring her to engage in a psychological evaluation and to take a gun safety course. *Appellant's Br.* at 19-20. The services ordered at disposition should be directed toward preserving and reunifying families without unduly interfering with the parent-child relationship. *In re E.M.* 4 N.E.3d 636, 647 (Ind. 2014). The juvenile court has broad discretion in determining which programs and services a parent should complete, so long as "the requirements are related to some behavior or circumstances that was revealed by the evidence*." In re K.D.* 962 N.E.2d 1249, 1258 (Ind. 2012).

[33]     Here, the trial court ordered Mother to take a psychological assessment because Mother was a victim of domestic abuse and had repeatedly recounted incidents from which she failed to protect herself and the children. *Tr. Vol. 3* at 41-42. The court believed that Mother still has not recognized that her "duty and responsibility" is to protect herself and the children. *Id.* at 42. The same evidence about Mother leaving the children alone with Father when he was heavily intoxicated with loaded firearms also supported the juvenile court's determination. *Tr. Vol 2* at 57-61. In addition, Mother struggles to appreciate the damage that an environment of domestic violence can inflict on the children. Mother interfered with DCS case managers' efforts to help the children by preventing them from interviewing the children and influencing the information that the children disclosed at those interviews by being present. *Id.* at 152, 199-200. Therefore, we conclude that the juvenile court did not abuse its discretion by requiring Mother to participate in a psychological assessment related to addressing Mother's lack of ability and awareness in protecting herself and the children from Father's violent behaviors.

[34]     Mother also challenges the juvenile court's order requiring her to take a gun safety course. *Appellant's Br.* at 19-20. Mother contends that DCS had already executed a safety plan with the family on April 17, 2019, which required: 1) the parents must lock away all weapons if they were to argue; 2) when the weapons are not locked away, the safety must be on; and 3) one sober parent must be present to care for the children. *Tr. Vol. 2* at 190. However, the evidence showed that Mother never seemed to understand the risk involved in

having unsecured weapons in the home with the children. *Id.* at 67-73, 151. The dispositional order requiring Mother to take a gun safety class would help her understand how the guns should be stored and how to treat firearms, which are paramount in making sure Mother is able to protect the children with guns in the house.

[35] We, therefore, conclude that DCS presented sufficient evidence to support that the children are CHINS, and the juvenile court did not abuse its discretion in ordering Mother to complete a psychological assessment and a gun safety course.

[36] Affirmed.

Riley, J., and Brown, J., concur.