# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 27 2020, 9:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Matter of A.H. (Minor Child), | August 27, 2020 |
| L.H. (Mother),[1] | Court of Appeals Case No. 20A-JC-879 |
| *Appellant-Respondent,* | Appeal from the Vigo Circuit Court |
| v. | The Honorable Daniel W. Kelly, Magistrate |
| Indiana Department of Child Services, | Trial Court Cause No. 84C01-2001-JC-30 |
| *Appellee-Petitioner.* | |

---

[1] Father does not participate in this appeal.

**Mathias, Judge.**

[1] L.H. ("Mother") appeals the Vigo Circuit Court's order adjudicating A.H., her minor child, a Child In Need of Services ("CHINS"). L.H. argues that the trial court's CHINS adjudication is not supported by sufficient evidence.

[2] We affirm.

## Facts and Procedural History

[3] In September 2019, Mother, two-year-old A.H.; K.R., who is A.H.'s maternal grandmother ("Grandmother"); S.R., who is Grandmother's ex-husband; and sixteen-year-old A.R., Mother's sister ("Sister"), lived together in a hotel in Terre Haute. The family's home was destroyed by fire, and they were temporarily living in motel rooms. On October 1, 2019, the Department of Child Services ("DCS") investigated a report that two-year-old A.H. was unsupervised and wandering in a hotel parking lot. A.H. was in Grandmother's care when the incident occurred. Grandmother was asleep and believed that Mother had taken A.H. with her to run errands.

[4] On October 19, 2019, DCS received another report of unsafe conditions in the home. One week later, DCS received a report that Grandmother was using methamphetamine and was under the influence of methamphetamine in A.H.'s presence. Grandmother was also physically violent with Mother while A.H. was present. Grandmother was asked to submit to a drug screen, but she refused to do so.

On November 3, DCS investigated reports that Grandmother continued to use methamphetamine. A DCS caseworker observed that Grandmother appeared to be under the influence of a narcotic. Mother informed the caseworker that she found a glass pipe that belonged to Grandmother. Both Mother and Sister informed the case worker that Grandmother had been using methamphetamine and that she struggles to control her anger when she is using. Mother told the caseworker that she, A.H., and Sister would be moving in with a friend due to Grandmother's drug use.

On November 27, a caseworker met with Sister, who informed the caseworker that Grandmother continued to use methamphetamine and did so in A.H.'s presence. Sister reported that Mother and Grandmother were living in a home with other adults who abuse illegal substances. The caseworker met with Mother and Grandmother in new their home that same day. Grandmother refused a drug screen. Mother and Grandmother informed the case worker that they were planning to move to the Rodeway Inn Motel.

On December 2, a caseworker made an unannounced visit to the Rodeway Inn Motel. Grandmother refused a drug screen and was angry with the caseworker. A.H. was present during this visit.

On December 28, Grandmother was charged with domestic battery. The next day, a caseworker made another unannounced visit to the motel. Sister, who was pregnant, reported that when she attempted to intervene in a fight between Mother and Grandmother, Grandmother hit her in the stomach, leading to the

domestic battery charge. Mother was upset that S.R., Grandmother's ex-husband, allowed the caseworker into their home. S.R. and Mother refused to submit to drug screens.

[9] On December 30, the caseworker returned to the motel and observed that A.H. had been left in Grandmother's care. Sister was also present in the motel room, and Grandmother was in violation of a no-contact order Sister obtained after Grandmother struck her. Grandmother left the motel room because she feared law enforcement officers were coming to the motel. A.H. was left in S.R.'s care. That same day, Grandmother was charged with possession of methamphetamine, possession of paraphernalia, and invasion of privacy.

[10] On January 8, 2020, DCS filed a petition alleging that A.H. is a CHINS pursuant to Indiana Code section 31-34-1-1. DCS alleged that Mother does not have stable housing, lives with Grandmother who uses methamphetamine in Mother's and A.H.'s presence, and that Mother leaves A.H. in Grandmother's and S.R.'s care knowing that they use methamphetamine. DCS also alleged that domestic violence has occurred between Grandmother and Mother in A.H.'s presence.

[11] An initial hearing was held on January 14, 2020. Counsel was appointed at Mother's request. The court ordered Mother to deny Grandmother access to or communication with herself and A.H. The court allowed A.H. to remain in Mother's care.

A fact-finding hearing was held on February 25, 2020, and A.H. was adjudicated a CHINS. The trial court found in pertinent part:

> 3. That on or around October 1, 2019, the Department of Child Services (DCS) received a report that [A.H.] got out of the hotel room … and was walking outside late at night.
>
> ***
>
> 5. That [Mother] underwent a drug screen[] for FCM Ligget, [Grandmother] refused.
>
> 6. That there may have been an issue with the hotel lock, which was fixed by the motel, and [Mother's] screen came back negative.
>
> 7. That while the parties were staying at the motel, they struggled to be able to continue to pay for their room; the first week DCS helped them by getting a church to pay for a week, the following week Community Partners was put in and they paid for a week, the third week the family found another church to help pay.
>
> 8. That evidence indicates that the family was waiting on [Mother and Grandmother's] SSI checks to come in to continue to pay for the motel.
>
> 9. That on or around October 26, 2019, DCS received another assessment on the family; [Mother] requested assistance from law enforcement because [Grandmother] came home late one evening and was strung out on drugs.
>
> 10. That [Mother and Grandmother] got into a domestic violence situation while [A.H.] was present.
>
> 11. That when law enforcement arrived on the scene, [Grandmother] had already left.
>
> 12. That [Mother] was questioned and drug screened for DCS, but denied that [A.H.] was in the home.
>
> 13. That [Mother] stated that [A.H.] was outside with [S.R.] (which is [Grandmother's] ex-husband and they have a No Contact Order against each other).

14. That [Mother's] screen came back negative while [Grandmother] again refused to screen.

15. That on or around November 3, 2019 law enforcement were called out again for a domestic violence situation.

16. That [Mother and Sister] disclosed to police that [Grandmother] was under the influence of methamphetamine and that [Grandmother and Mother] had been arguing about [Grandmother's] drug use. [Grandmother] appeared impaired.

17. That [Sister, Mother, and A.H.] left the motel and moved in with a family friend.

18. That [Mother] indicated to FCM Love that [Grandmother] was on methamphetamine and that she couldn't handle her mother, text messages from [Mother] stated that she believed that [Grandmother] needs help with her drug problem.

19. [Mother and A.H.] stayed with the family friend for a couple weeks, but [Sister] went back to live with her mother, [Grandmother] at the motel.

20. That FCM Supervisor Megan Richardson and FCM Love went to the motel to speak with [Grandmother and Sister].

21. That [Grandmother] denied using illegal drugs and again refused to undergo a drug screen.

22. That on or around November 5, 2019, [Sister and Grandmother] were going to be homeless.

23. That DCS put in Community Partners, but [Grandmother] cussed out the caseworker and refused to receive services.

24. That FCM Love called in a welfare check because [Grandmother and Sister] were texting [Mother] and saying they were going to commit suicide.

25. That FCM Love went back a couple days later and [Grandmother and Sister] were out of the motel.

26. That [Grandmother and Sister] went to move in with [Mother and A.H.] at a family friends home which lasted approximately a week.

27. That [Sister] discovered she was pregnant and does not want to go back home with [Grandmother] because [Grandmother] is on drugs.

***

29. That [Mother, A.H., and Grandmother] later moved [into] the Roadway Inn Motel.

30. That [Grandmother] continued to not screen for FCM Love and [Sister] refused to go home.

31. That FCM observed multiple times of [Mother] leaving [A.H. with Grandmother] alone, despite the two DV reports, drug allegations, and the fact that [Grandmother] refused to screen.

32. That later [Sister] moved back in with [Mother, Grandmother, and A.H.] at the motel.

33. That on or around December 28, 2019, law enforcement were called out to the home.

34. That it was reported by [Mother] that [Grandmother] jumped on [Mother's] back and was pulling her hair, [Sister] had got into the middle of the fight trying to stop them and was punched in the stomach by [Grandmother] who was later arrested.

35. That on or around December 30, 2019, FCM Love made an unannounced visit to the home, [Grandmother, A.H., S.R. and Sister] were at the motel.

36. That [Grandmother] was not supposed to be there due to the no contact order.

37. That [Grandmother] got up and left, [S.R.] was left with [A.H. and Sister].

38. [S.R.] drug screened for DCS, the results came back positive for methamphetamine/amphetamine.

39. That FCM Love called in a welfare check later that evening and law enforcement found [Grandmother, Mother, Sister and S.R.] in the motel.

40. That [Grandmother] was arrested for two counts of invasion of privacy, and possession of meth, and paraphernalia.

41. That DCS then requested [Grandmother's] access to [Sister] be restricted which was granted.

42. That [S.R.] admitted to [Sister] being a CHINS, but [Grandmother] denied.

43. That DCS later requested a no contact order between [Grandmother and A.H.], which was granted.

44. That [Grandmother] currently has the following pending criminal cases for which the Court took judicial notice:

> [Four criminal cause numbers redacted]

45. That [Mother], in open Court, refused to keep [Grandmother] from [A.H.], seemingly [] believ[ing] that there was no longer a problem and that she could supervise [Grandmother].

46. Due to the child's young age, she is unable to protect herself from domestic violence in the home and needs supervision by a sober caregiver.

47. That coercive intervention of the Court is necessary to protect this child due to the child's young age.

48. Coercive intervention of the Court is needed to continue to provide services and protect the children.

49. That there are continued and imminent concerns for the child, including but not limited to, being exposed to domestic violence and substance abuse.

50. That Mother has made no apparent effort to resolve any unmet financial need.

Appellant's App. pp. 85–87. The trial court ordered A.H. to remain in Mother's care. Sister was also adjudicated a CHINS and placed in Mother's care.

After holding the dispositional hearing, the trial court issued an order directing Mother to participate in recommended services and maintain contact with DCS. Mother was also ordered to allow DCS service providers to make unannounced visits, maintain appropriate housing and a source of income, submit to drug screens, and prevent any contact between Grandmother and S.R. with A.H. Mother now appeals the CHINS adjudication.

## Discussion and Decision

Mother argues that DCS failed to prove that A.H. was endangered or that the coercive intervention of the court was necessary. It is well-settled that

> [i]n all CHINS proceedings, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. When reviewing a CHINS adjudication, we do not reweigh evidence or judge witness credibility and will reverse a determination only if the decision was clearly erroneous. A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts.

*V.B. v. Ind. Dep't of Child Servs.*, 124 N.E.3d 1201, 1208 (Ind. 2019) (citations and quotation marks omitted).

DCS alleged that A.H. was a CHINS pursuant to Indiana Code section 31-34-1-1, which provides that a child under the age of eighteen is a CHINS under the following circumstances:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or

neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision;

  (A) when the parent, guardian, or custodian is financially able to do so; or

  (B) due to the failure, refusal or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and

  (2) the child needs care, treatment, or rehabilitation that:

  (A) the child is not receiving; and

  (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[16] "That final element guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter difficulty in meeting a child's needs.'" *J.B. v. Ind. Dep't of Child Servs.*, 2 N.E.3d 1283, 1287 (Ind. 2014) (quoting *Lake Cty. Div. of Fam. & Child. Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)). When considering this requirement, "courts should consider the family's condition not just when the case was filed, but also when it is heard." *Gr.J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 580 (Ind. 2017) (quotations omitted). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581.

[17] Mother argues that DCS failed to prove that A.H. was endangered because Mother has secured housing and protects her child from Grandmother. Mother

contends that the incidents investigated by DCS were "initiated by Grandmother with Mother reacting in a sober and responsible ways. For instance, when Mother could not handle Grandmother's behavior, Mother called the police and sent her child outside with a capable adult presumably so the child would not have to observe Mother's attempts to deescalate Grandmother's anger." Appellant's Br. at 12. Mother claims that she did not allow the upheaval in her family and unstable housing situation to impact A.H. *Id*.

[18] Grandmother uses methamphetamine and struggles with anger management. Although Mother has called law enforcement when necessary to deescalate a violent situation, A.H. has witnessed Grandmother's violence toward Mother. A child who witnesses domestic violence likely suffers significant psychological and developmental issues. *See S.H. v. D.W.*, 139 N.E.3d 214, 216 (Ind. 2020).

> [M]any people assume that very young children are not affected at all by violence between their parents, erroneously believing that they are too young to know or remember what has happened. But even in the earliest phases of infant and toddler development, clear associations have been found between exposure to violence and post-traumatic symptoms and disorders. Indeed, the developing brain is most vulnerable to the impact of traumatic experiences before age one—and during the first three years, those experiences actually change the organization of the brain's neural pathways.

*In re E.M.*, 4 N.E.3d 636, 644 (Ind. 2014) (quotations and citation omitted). Moreover, although A.H. has not been the victim of domestic violence, the CHINS statute does not require a court to wait until a tragedy occurs to

intervene. *See In re R.P.*, 949 N.E.2d 395, 401 (Ind. Ct. App. 2011); *see also In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010) (affirming a CHINS adjudication where there had been several incidents of domestic violence against Mother in the presence of her children).

[19] DCS proved by a preponderance of the evidence that A.H. witnessed domestic violence in her home and was present while Grandmother was using or under the influence of methamphetamine. DCS also proved that Mother left A.H. in Grandmother's care despite knowing that Grandmother uses methamphetamine and has physically abused Mother and Sister. This evidence was sufficient to establish that A.H. was seriously endangered by Mother's neglect.

[20] Mother also challenges the trial court's conclusion that A.H. needs care that she is not receiving and is unlikely to be provided without the coercive intervention of the court. Mother argues that A.H.'s needs are currently met because she no longer resides with Grandmother and Grandmother will not be allowed to live in Mother's home until she addresses her anger management issues. Tr. p. 64.

[21] DCS argues that Mother does not understand the negative impact A.H. suffers when she witnesses domestic violence and that without DCS intervention, Mother would let Grandmother into her home and allow her to provide care for A.H.

[22] Mother testified that Grandmother should be allowed to live in her home and that Grandmother is homeless. Tr. pp. 92–93. Mother stated that Grandmother

needs to be allowed to live in the home to assist Sister, who is pregnant. Tr. p. 64. Mother's testimony that Grandmother should address her anger management issues before she is allowed to live with and care for A.H. conflicts with other testimony that Grandmother should be allowed in their home immediately. *See id*. Mother stated that Grandmother would be allowed to move into her home while she is taking anger management classes. Tr. p. 71. Mother testified that Grandmother should be allowed to "help out" with A.H. and Sister. Tr. p. 68; *see also* Tr. p. 71.

[23] Mother's desire to have Grandmother immediately return to the home she lives in with A.H. was proved by Mother's own testimony. Mother wants Grandmother's assistance in caring for A.H. It is concerning that Mother testified that she did not know if Grandmother was abusing drugs even though she had previously told law enforcement officers and DCS service providers that Grandmother was under the influence of methamphetamine and needed help with her drug problem. Tr. pp. 31–32, 63, 70.

# Conclusion

[24] DCS proved that it is difficult for Mother to obtain stability for herself and A.H. when Grandmother is allowed to reside with the family. Despite Mother's claims to the contrary, A.H. is not unaffected by Grandmother's violent behavior and drug abuse. Because Mother lacks understanding that Grandmother's presence in the family's life endangers A.H., and because Mother intends to allow Grandmother to reside in her home unless she is not

permitted to do so by court-order, DCS proved that the coercive intervention of the court is necessary.

[25] For all of these reasons, we conclude that DCS proved by a preponderance of the evidence that A.H. is a CHINS.

[26] Affirmed.

Bradford, C.J., and Najam, J., concur.