## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 14 2020, 8:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of E.B. (Child in Need of Services):

M.R. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

September 14, 2020

Court of Appeals Case No. 20A-JC-849

Appeal from the Dearborn Circuit Court

The Honorable James D. Humphrey, Judge

Trial Court Cause No. 15C01-1911-JC-54

**Bailey, Judge.**

# Case Summary

[1] Following fact-finding and dispositional hearings and orders, M.R. ("Mother") appeals[1] the trial court's order adjudicating her child, E.C.B. ("Child"), to be a Child in Need of Services ("CHINS"). She raises one issue on appeal, namely, whether there is sufficient evidence to support the determination that Child is a CHINS.

[2] We affirm.

# Facts and Procedural History

[3] Child was born on April 23, 2015, and Mother was his custodian. In early 2019, Child and Mother were living with Child's siblings, J.P.D. (born July 7, 2017) and J.L.D. (born February 27, 2019), and Child's step-father, P.D. ("Step-Father"), in Decatur County. In May of 2019, the Decatur County Department of Child Services ("DCS") received reports that Child and his siblings were "found wandering outside the home, alone and without any adult supervision." Ex. at 5. DCS filed a CHINS petition in which it alleged that the children were not adequately supervised, especially given that all three children had a serious medical condition, i.e., "Severe A Hemophilia." *Id.* However,

---

[1] E.B. ("Father") does not actively participate in this appeal.

Decatur County DCS ultimately allowed Mother and Step-Father to enter into an informal adjustment.

[4] In October of 2019, Mother and all three of her children moved in with A.N., Child's maternal grandmother ("Grandmother"), and L.R., Child's maternal aunt ("Aunt"), in Dearborn County. In November of 2019, Dearborn County DCS received several reports related to Child and his siblings. On November 13, it was reported that Child had a bruise the size of a hand on his arm. On November 15, DCS received a report "regarding neglect" in which it was reported that Mother had taken Child to a mental health facility for treatment. Tr. V. II at 17. On November 17, DCS received a report that Child had sustained bruising while at an in-patient mental health facility and that Child reported past inappropriate sexual conduct with an uncle. DCS also received allegations that Mother was inappropriately disciplining Child and failing to give him proper, necessary medical care.

[5] On November 21, Dearborn County DCS removed Child and his siblings from the home and placed them with Step-Father. On November 22, DCS filed a petition alleging Child and his siblings were CHINS;[2] however, the petitions relating to Child's siblings were ultimately dismissed when Step-Father was awarded custody of them. The CHINS allegations regarding Child, who was diagnosed from birth with hemophilia, were that he had to be removed from

---

[2] The Decatur County informal adjustment was "discharged unsuccessfully" when Dearborn County DCS removed the children and filed a CHINS petition. App. at 79.

Mother's home because he continued to be injured while in her care and his injuries could have resulted from a lack of proper medication. The CHINS petition alleged that the hospital had "concerns that the lack of supervision and intervention on behalf of mother could lead to a potentially fatal situation based on [Child's] severe disorder." App. at 27.

[6] On November 25, 2019, Mother appeared at a detention/initial CHINS hearing at which she denied the CHINS allegations. The juvenile court held CHINS fact-finding hearings on January 30, February 3, and February 5, 2020. On February 20, the court issued its order adjudicating Child to be a CHINS. In support of that conclusion, the juvenile court made the following relevant factual findings:

> f) FCM [Chelsea] Morgan [of Decatur County DCS] further testified that mother never completed a mental health evaluation, which was requested in May 2019. Mother did provide a letter from her doctor stating that she did not show any signs of anxiety or post-partum depression and that she could return to work. However, a full mental health evaluation was never completed. (Exhibit A)
>
> * * *
>
> h) The Preliminary Inquiry from Decatur County was also admitted into evidence. The inquiry indicates that the family had DCS involvement in 2017. [Child] had injuries that mother could not explain and did not know how they occurred, which was a concern about lack of supervision. (Exhibit 2)

i) The child's primary hematologist, Dr. Eric Mullins, testified about the child's medical condition and any concerns he had about mother's ability to parent and supervise the children.

j) Dr. Mullins testified that the child's medical condition, Severe A Hemophilia, means that the child does not have a certain protein that would allow his blood to clot (clot factor 8). The child receives an injection of that protein three (3) times per week to ensure that he does not have significant "bleeds". Mother has been keeping "bleed logs" to show that she is giving the child his medication regularly; Dr. Mullins indicated that her logs are "too perfect" for someone who was providing that medication. Based upon this testimony, the Court finds that these logs were likely not genuine. The Court also finds that the condition is particularly significant since the child has a complete lack of clotting factor 8. It is, therefore, extremely important that medication be given as directed, that the child be properly supervised, and that there be no physical discipline. Failure to follow these directives could lead to serious health complications for the child.

k) Dr. Mullins also testified that if a dose of the medication is missed, the proper procedure would be to give the medication the following day, then get back on the regular schedule. The doses should not be doubled if one is missed. In addition, both parents have been trained on the proper procedure for administering the medication.

l) Dr. Mullins further testified about an incident that occurred while he was with mother and [Child] at the hospital. The child was jumping off of furniture and running around the room while the doctor was speaking with mother. The child jumped off of furniture twice and smacked his head on the ground. The first time, the child did not appear injured, and Dr. Mullins examined him and cleared him. The second time it happened, the child did injure himself and sustained an injury to his ear. On both

occasions, mother acknowledged the child's behavior, but took no steps in stopping him from jumping around. A picture of the child's injury was documented and submitted to the Court. (Exhibit 3)

m) Family Case Managers Jameelia Bowie and Carol Mulley also took pictures of various injuries to [Child] and another Child, J.D. The injuries to the children range in degrees of severity, the most severe being a large purple bruise on the leg of [Child]. (Exhibit 4)

n) Dr. Mullins testified that, due to the child's condition, corporal punishment of any kind should not be used. Additionally, Dr. Mullins stated that the child needs to be given his medication regularly and supervised at all times, or he could die.

o) [L.R.], mother's sister, testified that she has witnessed and heard mother spank [Child]. She also testified that she has witnessed mother give the child multiple doses [of medication] when he missed one, which she knew was against proper procedure.

p) [A.N.], maternal grandmother, testified that she has heard mother spank [Child] at least once. She also stated that it didn't appear that the child was injured, but she knew that mother shouldn't be spanking her children. [A.N.] also stated that mother was aware that [A.N.] and [L.R.] were going to testify at this Fact[-]Finding Hearing and had threatened to call the Department on them. [A.N.] further stated that an employee from Dearborn County DCS had come out to her home regarding a recent report and that an assessment had been opened. [A.N.] provided screen shots of text messages from mother stating that she would be calling the Department on [A.N.] and [L.R.]. (Exhibit 5)

q)  [Step-Father], father of [Child's siblings] and placement of [Child], testified that he was trained in administering the children's medication.  He stated that he always followed the proper procedure when administering the medication and followed all of the doctors' orders regarding the children.

r)  [Step-Father] also testified that he had witnessed mother not following the proper procedures when administering the child's medication and that he had witnessed her give the child double doses of the medication when a dose was missed.

s)  [Step-Father] testified that he and mother lived together for some time and that he was not home when the children were left unsupervised.  The first time it happened, on May 11, 2019, [Step-Father] was not home and was helping his mother move into a new house.  [During t]he second incident, on May 16, 2019, [Step-Father] was at work.  Before he left for the day, he made sure mother was awake, which she was.

t)  [Step-Father] also stated that the hospital has advised him that mother should not be permitted to administer the child's medication, due to concerns of her lack of medical care.

u)  Mother, [M.R.], testified that she was told by FCM Morgan that the letter from her doctor was enough for the Department and that she wouldn't have to complete a psychological evaluation or mental health assessment.  Mother additionally stated that FCM Rachel Leonard had told her that she needed to complete a mental health assessment.  At the time of the hearing, mother had not completed the mental health assessment.  The Court finds that this letter is insufficient to give a complete picture of mother's mental health.

V) Mother also accused [Step-Father] of not following appropriate procedures for administering the child's medication while they lived together.

w) Mother has been charged with Neglect of a Dependent out of Decatur County in cause number: 16D01-1905-F6-000680. She also signed a Criminal Diversion Agreement and is required to comply with all requirements of the Informal Adjustment with the Department. (Exhibit 6)

X) Mother's counsel refused to allow mother to answer any questions regarding her charge of Neglect of a Dependent or the terms of her Diversion Program, by arguing that mother would invoke her Fifth Amendment rights if questioned about those topics. The Court sustained the objection.

y) Mother has also not visited the child since he was detained, despite knowing where he was located and [being] offered visitation.

z) The Department of Child Services has been notified multiple times over the last few years regarding this family and the lack of supervision of the children, as well as the lack of medical care. As Dr. Mullins testified, if the child is not properly and regularly medicated and supervised, the child could die. Mother has not been appropriately supervising the child, and there are still concerns from the doctor, as well as the child's placement, that mother is not giving the child his medication as prescribed.

aa) Based on the testimony received and evidence submitted, the Department has shown by a preponderance of the evidence that the child is a Child in Need of Services, and services should be offered to the family to address the lack of supervision and lack of appropriate medical care.

App. at 79-81.

[7] Following a March 9 dispositional hearing, on March 20 the juvenile court issued a dispositional order in which Child's placement was continued with Step-Father and Mother was ordered to participate in reunification services. Mother now appeals.

# Discussion and Decision

[8] Mother challenges the sufficiency of the evidence to support the CHINS determination. In reviewing a CHINS determination,

> we give due regard to the trial court's ability to assess the credibility of witnesses. *In re Des.B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014). We neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence and reasonable inferences most favorable to the trial court's decision. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). Where the trial court issues findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.P.*, 949 N.E.2d 395, 400 (Ind. Ct. App. 2011). We consider first whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id.* Appellate courts generally grant latitude and deference to trial courts in family law matters. *Matter of E.K.*, 83 N.E.3d 1256, 1260 (Ind. Ct. App. 2017), *trans. denied* (2018). This deference recognizes the trial court's "unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this court's only being able to review a cold transcript of the record." *Id.*

*In re A.M.*, 121 N.E.3d 556, 561-62 (Ind. Ct. App. 2019), *trans. denied*.

[9] A CHINS adjudication under Indiana Code Section 31-34-1-1[3] requires three basic elements: "that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Courts should consider the family's condition not only at the time the CHINS case was filed, but also when the case is heard at the fact-finding hearing. *In re D.J.*, 68 N.E.3d 574, 580 (Ind. 2017). DCS has the burden of proving by a preponderance of the evidence that the child is a CHINS. *See, e.g.*, *In re K.S.*, 78 N.E.3d 740, 744 (Ind. Ct. App. 2017). DCS may not simply rely upon allegations; rather, it must gather the facts and the evidence to support its CHINS petition. *In re D.B.*, 43 N.E.3d 599, 606 (Ind. Ct. App. 2015).

[10] Here, the trial court based its CHINS determination on evidence that Mother repeatedly failed to appropriately supervise and provide necessary medical care to Child. Dr. Mullins testified that Child has a serious medical condition—

---

[3] Indiana Code Section 31-34-1-1 provides:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

    (A) the child is not receiving; and

    (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Severe A Hemophilia—that requires specific medical care and that the failure to provide such care could lead to serious health complications, including death. He testified that part of the necessary medical care is refraining from inflicting corporal punishment upon Child. Yet, Grandmother, Aunt, and Step-Father, all of whom lived with Mother and her children during relevant time periods, testified that they had witnessed, on multiple occasions, Mother fail to give Child necessary medication and/or give Child incorrect doses of medication. Grandmother and Aunt also testified that they witnessed, on multiple occasions, Mother physically discipline Child. Moreover, Dr. Mullins and the DCS FCMs all testified that Mother failed to adequately supervise Child at various times, leading to injuries. That testimony was sufficient evidence that Mother endangered Child by failing to adequately supervise and provide medical care, thus leaving Child's needs unmet. And Mother's repeated failures to adequately supervise and care for Child despite DCS's attempts to work with her through informal adjustment are sufficient evidence that court intervention is necessary in order for Child to obtain necessary supervision and medical care.

[11] Mother contends that Grandmother and Aunt were not reliable witnesses. She also alleges that her "bleed logs" proved that she did give Child the necessary medical care. However, the trial court specifically found—based on Dr. Mullins's testimony—that the "bleed logs" were "likely not genuine." App. at 79. And the juvenile court gave credit to Grandmother's and Aunt's testimony.

We may not reweigh evidence or assess witness credibility on appeal. *In re A.M.*, 121 N.E.3d at 561.

[12] Because there was sufficient evidence that Child was seriously endangered by Mother's actions and inactions at the time of removal, Child's need for safety was unmet, and Mother was unlikely to meet Child's need for safety without court intervention, the CHINS adjudication was not clearly erroneous.

[13] Affirmed.

Vaidik, J., and Baker, Sr. J., concur.